**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3836-16T3

BRENDA CIPRIANI,

      Plaintiff-Appellant,

v.

THE VALLEY HOSPITAL, INC.,
and VALLEY HEALTH SYSTEM,
INC.,

      Defendants,

and

ROBERT A. KAYAL, M.D.,
and KAYAL ORTHOPAEDIC
CENTER, PC,

      Defendants-Respondents.

_____

Submitted June 7, 2018 – Decided March 15, 2019

Before Judges Rothstadt and Gooden Brown.

On appeal from Superior Court of New Jersey, Law Division, Bergen County, Docket No. L-1471-14.

Phillips & Paolicelli, LLP, attorneys for appellant (Daniel J. Woodard and Yitzchak M. Fogel, on the briefs).

Mattia, McBride & Grieco, PC, attorneys for respondents (Michael J. McBride, Zachary G. Farnsworth, and Jillian P. Freda, on the brief).

The opinion of the court was delivered by

GOODEN BROWN, J.A.D.

In this medical malpractice case, plaintiff Brenda Cipriani appeals from an adverse judgment entered on April 7, 2017, after a jury rendered a verdict of no cause of action in favor of defendants Robert A. Kayal, M.D., her orthopedic surgeon, and his practice, Kayal Orthopaedic Center, PC (Center), a comprehensive orthopedic center dealing with muscular skeletal conditions (collectively, defendants). We affirm.

On February 7, 2014, plaintiff filed a complaint against defendants,[1] alleging medical malpractice and lack of informed consent, as well as other causes of action not relevant to this appeal. In the complaint, plaintiff asserted that on May 23, 2011, Kayal improperly performed knee revision surgery on her left knee and failed to inform her of the risks, hazards, and alternatives to the

---

[1] The complaint also named as defendants The Valley Hospital, Inc. and Valley Health System, Inc. However, those defendants were dismissed on February 25, 2016, pursuant to a voluntary stipulation of dismissal.

treatment rendered. According to plaintiff, despite treating with defendants after the May 23, 2011 surgery, continuously complaining of pain, and undergoing numerous radiological studies at defendants' behest, it was not until a September 12, 2012 office visit that Kayal disclosed to her that she had incurred a stress fracture in her tibia, causing her to seek treatment from other medical providers.

On the eve of trial, defendants moved in limine to bar reference to a check in the amount of $2500 dated September 13, 2012, that Kayal had sent to plaintiff after the September 12, 2012 office visit. The trial judge granted the motion. During the ensuing seven-day trial, plaintiff, her two daughters, Kayal, a podiatrist employed by the Center, and several medical and non-medical experts testified. According to plaintiff, she began treating with Kayal for knee pain in 2000. In 2001, Kayal performed arthroscopic surgery on her left knee, followed by knee replacement surgery, because the arthroscopic procedure did not adequately manage her symptoms. Plaintiff acknowledged that Kayal advised her that eventually, she may need to have the knee replacement surgery revised. However, according to plaintiff, after the surgery and the physical therapy, her knee "felt great, and . . . stayed that way until [she] fell" in February 2011 and "twisted [the same] knee." As a result of the fall, plaintiff's "knee started to swell" and "hurt a lot," prompting her to return to Kayal for treatment.

After obtaining x-rays and draining fluid from the knee, on May 23, 2011, Kayal performed knee revision surgery[2] at Valley Hospital. Although Kayal testified that he informed plaintiff of "the risks and benefits of surgical and non-operative care[,]" according to plaintiff, Kayal only informed her that "it was a much more serious operation[,]" and the recovery would require a total of six months, three months more than the first surgery. Plaintiff stated Kayal never advised her about pain or permanent limitations resulting from the surgery. After the surgery, plaintiff underwent extensive physical therapy on the knee until she returned to work at Kohl's in September 2011. However, according to plaintiff, unlike the first surgery, she had excruciating pain immediately following the second surgery that continued after she returned to work. When

---

[2] Although both procedures have the same goal, namely, to relieve pain and improve function, according to the experts, revision surgery is different from primary total knee replacement. In a primary total knee replacement, certain amounts of the femur and tibia bone are "resect[ed]," and the patella is "resurface[d]." The implant, an artificial knee joint or prosthesis, is then "fixated" or "cement[ed]" to the bone. In the revision surgery, the old prosthesis, which would have grown into the existing bone due to the cement, is removed, and the surgical area is prepared for the revision implant, which is different from the primary implant. Because the process of removing the implant involves "breaking it off the bone," and "chisel[ing it] . . . off [while] trying to preserve as much host bone as possible," when the old prosthesis is removed, there is less bone remaining that "has to be compensated for," by "anchor[ing]" the implant into the bone. Once the new implant is inserted, it must be correctly aligned to ensure "natural anatomic alignment," as a deviation from the average degrees of valgus can lead to early failure of the knee prosthesis or loosening of the implant components.

she complained to Kayal about the pain during her follow-up visits, he obtained additional x-rays, which revealed "[n]o evidence of loosening or osteolysis" or "periprosthetic fracture," and "no signs of stress fracture." Thus, he referred her for more therapy. By January 2012, the pain had gotten "worse" and, as a result, "[she] was having a lot of trouble at work."

In March 2012, Kayal had plaintiff undergo "a bone scan," which was normal, after which he referred her to his associate, Chad Rappaport, DPM. Rappaport conducted further testing and diagnosed her with "anterior tarsal tunnel syndrome, or entrapment of peroneal nerve[,]" which he testified was unrelated to the knee replacement. On May 29, 2012, Rappaport performed "[a] common peroneal nerve release and a tarsal tunnel release" to "[a]lleviate pressure on . . . [her] nerves" that he believed was causing her continuous pain. After the procedure, plaintiff no longer had the burning pain in her in-step or on the outside of her leg, but "still had the pain in [her] shin" or "tibia" and continued seeing defendants for follow-up treatment. After undergoing additional physical therapy, a MRI conducted in August 2012 revealed "no fractures" and "normal bone marrow."

However, on September 12, 2012, while "waiting on a customer" at work, "out of [nowhere,]" plaintiff experienced "unbelievable" pain that "felt like an explosion in [her] leg." Her daughter rushed her to Kayal's office, and, after an

x-ray, Kayal diagnosed a stress fracture in plaintiff's left tibia and advised her to be non-weight bearing for two to three months, meaning she could not put any weight on the leg. Kayal prescribed a scooter for her to have mobility around her house and later a wheelchair. Plaintiff testified that when Kayal informed her "[she] would have to be off of [her leg]" for an extended period of time or risk "break[ing]" it, "[she] was beside [her]self" because she "had just gotten back to work[,]" "[she] could[] [not] take any[] [more] time off[,]" and she was already "out of disability [benefits]."

On September 17, 2012, plaintiff returned to Kayal for a follow-up visit, during which she informed him that she was going to get a second opinion, a decision with which Kayal agreed. Thereafter, plaintiff rejected the specialist Kayal recommended and went to the Hospital for Special Surgery where the fractured tibia diagnosis was confirmed, and another revision surgery was performed on November 19, 2012. After the second revision surgery and ensuing physical therapy, initially, plaintiff's left leg "felt pretty good" and she was able to walk again, albeit "with a limp." However, later, "[t]he pain in [her] shin started coming back" and on April 8, 2013, she was informed by the Hospital for Special Surgery doctor that she could "no longer go back to work." Plaintiff, then seventy-three years old, testified that although she was collecting her social security benefits, she still worked "[t]o pay [her] mortgage."

6

However, as a result of the ordeal, "[she] almost lost [her] house, . . . had to re-mortgage," and had to learn to live with the physical limitations.

Plaintiff's expert, Dr. Andrew Collier, opined that Kayal "depart[ed] from the standard of care" in his performance of the May 23, 2011 knee replacement revision by the improper placement of the implant system or prosthesis into plaintiff's leg. Collier testified the misalignment caused premature loosening of the prosthesis, which resulted in pain and a stress fracture to her tibia, necessitating the revision surgery at the Hospital for Special Surgery. According to Collier, Kayal's negligence caused plaintiff's pain, permanent limitations, and disability. However, Collier acknowledged that "[a]ll prosthesis can eventually loosen" in the absence of negligence. Additionally, although Collier opined that the standard of care for alignment was "two to eight" degrees valgus, whereas Kayal's valgus alignment was approximately nine degrees, he admitted that the section of Campbell's Operative Orthopedics cited in his report as the authoritative text to support his opinion discussed initial knee alignments with "normal anatomy[,]" not revision knee replacements. Collier also admitted that his first report contained errors.

In contrast, defendants' expert, Dr. David Daniel Bullek, who had more training and experience with total knee replacement and revision surgeries than Collier, countered that Kayal "did not deviate from the acceptable standards of

care." According to Bullek, Kayal "appropriately evaluated [plaintiff's] aseptic loosening of her primary knee replacement, . . . preoperatively discussed that procedure with her, implanted the revision prosthesis in a satisfactory alignment with good stability," and provided "satisfactory" "postoperative care." Bullek testified that revisions fail more often than "primary knee replacements[,]" at a rate of approximately "two percent per year[,]" even when a surgeon does everything correctly, and a stress fracture was a risk of the procedure. He explained that "[r]evisions in general are a much bigger surgery than a primary and the outcomes are not as good." According to Bullek, "[i]n revision knee replacements, about [twenty] percent of people will have residual walking pain[,]" "[t]en percent will have rest pain[,]" and "[fifty] percent . . . will need an ambulatory aid." Further, contrary to Collier, Bullek testified that "there [was] no accepted standard range [of anatomic valgus] in revision[] [surgery]." He also rejected Collier's reliance on Campbell's Operative Orthopedics as inapplicable.

On March 29, 2017, the six-member jury unanimously found no deviation from accepted medical standards in Kayal's performance of the May 23, 2011 surgery. The judge entered a memorializing order and this appeal followed.

On appeal, plaintiff challenges the judge's ruling on defendants' in limine motion, barring any reference to the $2500 check Kayal sent to plaintiff shortly

after her September 12, 2012 office visit. In his deposition testimony, Kayal acknowledged that he sent the check "to take care of [her] mortgage" because when he broke the news to her about the fracture, she was inconsolable and said "she [could not] be out of work" because she would not to be able "to pay her mortgage." According to Kayal, he wrote the check out of "compassion[] and empath[y]" and to fulfill his "obligation and duty to be Godly," because she had been a patient "since 1999" and he had "done this many times for different patients." Kayal explained that $2500 was "a drop . . . [in the] bucket for [him], but for [plaintiff], it was going to allow her to get through her six weeks of being non-weightbearing." Kayal later learned that the check was never cashed.

In an oral decision placed on the record on March 20, 2017, the judge recounted Kayal's deposition testimony in which he explained he sent her the unsolicited check "to help plaintiff with her mortgage and other bills" because she would be "incapacitate[d] . . . for at least two months" and "was upset, [and] distressed that she would lose that amount of time without income[.]" The judge then summarized plaintiff's proffer as follows:

> Plaintiff's proffer for introduction of this evidence is . . . connected to the issue of credibility of Dr. Kayal, and also the fact that . . . the issuance of this check was what broke the . . . patient-physician relationship and . . . propelled plaintiff to seek another opinion, and in fact, revision surgery to that condition in November of 2012 with another doctor at another

medical facility. So . . . plaintiff maintains that this . . . evidence concerning Dr. Kayal's payment of a check to her is absolutely essential for the . . . relevant issue of her course of treatment and a break in the trust of Dr. Kayal and the reason why she went to another doctor, and also passively shows the doctor's acknowledgement of responsibility during that period of time between the . . . May 23, 2011 surgery and the diagnosis of a stress fracture by paying the check he is acknowledging some sort or responsibility for that having happened.

In excluding the evidence under Rule 403 and 408, the judge reasoned:

[W]hile this evidence may be relevant . . . perhaps to the issue of credibility as to Dr. Kayal, . . . its probative value is substantially outweighed by . . . undue prejudice. Under the circumstances here, . . . it sounds more to me like plaintiff will present the evidence and tilt it in a way to infer that Dr. Kayal accepted responsibility or acknowledged negligence and . . . in exchange for that, and in order to continue with the good graces of the patient, paid her off, essentially, to continue treating with him.

Under the circumstances, this sounds more like a payment to compromise or to acknowledge negligence and . . . settle for those wrongs done in exchange for continued medical treatment in the future by plaintiff, and this is barred by Rule 408 which bars settlement offers or negotiations which . . . shall not be admissible to prove liability in . . . a trial such as this.

So under the circumstances, the whole import sounds to me exactly like an offer of settlement, an offer to compromise, an offer to appease the patient so the patient remains quiet. It is a compromise, a settlement of a wrong done, and that the doctor would continue to treat . . . plaintiff.

> . . . [B]ut if that is not found to be sufficient, it is also barred by Rule 403 where I find that this evidence is so unduly prejudicial that it will distract the issue and the probative nature that it . . . may also have. So while it may be relevant, it happened between the two parties in the actual course of treatment, of course it's relevant. It is unduly prejudicial. It will steer the case away from the actual issue which is . . . whether or not Dr. Kayal deviated from accepted standards of care on May 23, 2011.

Plaintiff argues the judge erred in barring the check under Rule 408 because when "Kayal offered the unsolicited check, there was no disputed claim; no settlement negotiations; and no quid pro quo, as [plaintiff's] acceptance of the check (had she cashed it . . . ) would not have settled or compromised anything[,]" rendering the Rule inapplicable. Plaintiff continues that even if Rule 408 was applicable, "the check would have been admissible" for purposes other than proving liability, including impugning Kayal's credibility by showing he "felt responsibility for his improper performance of the surgery" or "to explain to the jury why [plaintiff] terminated the doctor-patient relationship with" Kayal and sought treatment elsewhere.

Further, plaintiff argues that while the judge "correctly found that the check was relevant evidence," she "abused [her] discretion in finding the evidence unduly prejudicial" inasmuch as the check's relevancy was not substantially outweighed by undue prejudice under Rule 403. Finally, plaintiff

asserts that because the evidence at trial did not "overwhelmingly favor[] one side[,]" and "the jury grappled with two different versions" of "Kayal's care of [plaintiff]" as well as "conflicting expert testimony about the performance of the surgery and delay in diagnosis," limiting her ability "to attack . . . Kayal's credibility by presenting evidence" of the check "severely prejudiced" her case and "was not harmless error[.]"

"[T]he decision to admit or exclude evidence is one firmly entrusted to the trial court's discretion." Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). "When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'" Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)). Thus, we "will reverse an evidentiary ruling only if it 'was so wide off the mark that a manifest denial of justice resulted.'" Ibid. (quoting Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 492 (1999)).

Under Rule 408:

> When a claim is disputed as to validity or amount, evidence of statements or conduct by parties or their attorneys in settlement negotiations, with or without a mediator present, including offers of compromise or any payment in settlement of a related claim, shall not be admissible to provide liability for, or invalidity of, or amount of the disputed claim. Such evidence shall

not be excluded when offered for another purpose; and evidence otherwise admissible shall not be excluded merely because it was disclosed during settlement negotiations.

[N.J.R.E. 408.]

This rule encompasses the long-accepted notions that "social policy favor[s] and encourag[es] amicable out-of-court settlements" of legal disputes, Leslie Blau Co. v. Alfieri, 157 N.J. Super. 173, 200 (App. Div. 1978), and "that confidentiality is a 'fundamental ingredient of the settlement process[.]'" State v. Williams, 184 N.J. 432, 446 (2005) (quoting Brown v. Pica, 360 N.J. Super. 565, 568 (Law Div. 2001)). Indeed, there is significant value in keeping settlement offers confidential and not permitting their use to establish liability or damages because otherwise, "many of them might never be made." Ibid. (quotation marks and citation omitted).

Here, based on Kayal's deposition testimony, the check was neither an offer to compromise, offered in settlement negotiations, nor offered in consideration for any release of liability. Therefore, we disagree with the judge's ruling that Rule 408 barred its admission. However, under Rule 403, "relevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative

evidence." N.J.R.E. 403. "The party seeking the exclusion of the evidence must demonstrate that one or more of the factors listed in [Rule] 403 substantially outweighs the probative value of the evidence." Griffin, 225 N.J. at 420.

When the Rule 403 factor invoked is the risk of "undue prejudice," "the question is not whether the challenged testimony will be prejudicial to the objecting party, 'but whether it will be unfairly so.'" Id. at 421 (quoting Stigliano v. Connaught Labs., Inc., 140 N.J. 305, 317 (1995)). "Evidence claimed to be unduly prejudicial is excluded only when its 'probative value is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation' of the issues in the case." Ibid. (alteration in original) (quoting State v. Koskovich, 168 N.J. 448, 486 (2001)).

"Due to the nature of the weighing test, highly prejudicial evidence may only be admitted if it has 'overwhelming probative worth.'" Parker v. Poole, 440 N.J. Super. 7, 21 (App. Div. 2015) (quoting Green, 160 N.J. at 491). However, "[t]he mere fact that 'evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof.'" Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001) (quoting State v. West, 29 N.J. 327, 335 (1959)). In making the determination, "the trial court has broad discretion in determining whether the probative value of evidence is significantly outweighed

by the risk of undue prejudice." State v. Scherzer, 301 N.J. Super. 363, 425 (App. Div. 1997) (citing State v. Sands, 76 N.J. 127, 144 (1978)). Such a determination "should not be overturned on appeal 'unless it can be shown that the trial court palpably abused its discretion, that is, that its finding was so wide off [sic] the mark that a manifest denial of justice resulted[,]'" Verdicchio v. Ricca, 179 N.J. 1, 34 (2004) (first alteration in original) (quoting Green, 160 N.J. at 492), or "there has been a 'clear error of judgment[.]'" Scherzer, 301 N.J. Super. at 425 (quoting State v. Koedatich, 112 N.J. 225, 313 (1988)).

Here, we are satisfied that the judge's exclusion of the evidence under Rule 403 did not constitute a mistaken exercise of discretion or a clear error of judgment. Among other things, plaintiff acknowledged she sought to introduce the check to show that Kayal "felt responsibility for his improper performance" of the procedure, which was tantamount to him admitting liability. However, the check was not an acknowledgement of liability, but was intended to pay plaintiff's mortgage while recovering from the stress fracture, regardless of its cause.

In Rosenblit, 166 N.J. at 411, our Supreme Court ordered "a new malpractice trial" and held that evidence of the defendant doctor's "misdeeds" was not excludible under Rule 403. However, unlike Rosenblit, here, there was no "evidence of intentional alteration or destruction of medical records by a

A-3836-16T3

physician accused of malpractice." Id. at 410. In Verdicchio, 179 N.J. at 33-34, the Court held that the plaintiff mother's testimony about her conversation with the defendant doctor regarding her son's condition was relevant and not unduly prejudicial. The Court determined that the plaintiff mother's testimony that the defendant continued to deny that her son had "cancer in the face of a definitive diagnosis to the contrary" bore

> on whether [the defendant] approached the case, as was implicit in his testimony and that of his experts, as a reasonable physician would have, or whether his preconceived theories about [plaintiff mother and her son], or his belief in the unassailability of his own clinical judgment, affected his approach to [the] case. At the very least, the testimony bore on which of the starkly disparate versions of the various interactions between [the defendant] and the [plaintiffs] the jury would ultimately accept. Thus, like the trial court, we cannot say that that evidence had no logical connection to the issue in the case or that it was not one tile in the factual mosaic presented to the jury.
>
> [Id. at 34-35.]

However, unlike Verdicchio, where the testimony went directly to the plaintiffs' cause of action, which was "failure to diagnose cancer[,]" id. at 7, here, as the judge explained, the evidence of the check bore no relation to the actual issue in the case, "whether or not Dr. Kayal deviated from accepted standards of care on May 23, 2011." Therefore, we will not disturb the judge's

ruling that the probative value of the check was outweighed by the prejudicial effect.[3]

We also reject plaintiff's contention that exclusion of the evidence had the potential to affect the outcome unjustly. We are required to disregard an error unless, after consideration, we find "it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2. "Thus, even though an alleged error was brought to the trial judge's attention, it will not be grounds for reversal if it was 'harmless error.'" State v. J.R., 227 N.J. 393, 417 (2017) (quoting State v. Macon, 57 N.J. 325, 337-38 (1971)).

However,

> [a]n evidentiary error will not be found "harmless" if there is a reasonable doubt as to whether the error contributed to the verdict. The prospect that the error gave rise to an unjust result "must be real [and] sufficient to raise a reasonable doubt as to whether [it] led the jury to a verdict it otherwise might not have reached."
>
> [Ibid. (second and third alterations in original) (citations omitted).]

---

[3] Defendants argue for the first time on appeal that Rule 409 would exclude the check as "it was issued out of humanitarian concern." Because defendants did not raise this issue before the trial judge, and the issue is not jurisdictional in nature nor does it substantially implicate the public interest, we decline to address it, particularly given our decision. Zaman v. Felton, 219 N.J. 199, 226-27 (2014).

Applying these principles, even assuming error in the exclusion of the check, such error was harmless. The testimony of the parties' respective medical experts, rather than the testimony of the parties themselves, was the crux of this case. Indeed, in the final jury charge, the judge instructed the jurors that "the standard of practice by which a physician's conduct is to be judged must be furnished by expert testimony[,]" and the jurors "must determine the applicable medical standard from the testimony of the expert witnesses . . . in this case." Thus, the check had no connection to whether Kayal committed medical malpractice by deviating from the applicable medical standard furnished by the expert testimony.

We also reject plaintiff's reliance on Parker, where the proofs did "not overwhelmingly favor one party or the other[,]" "[the defendant doctor's] credibility was central to the outcome of the case[,]" "the improper exclusion of defendant's contradictory deposition testimony could have been the deciding factor in his favor[,]" and "[t]he excluded deposition testimony bore directly on the issue of defendant's negligence." 440 N.J. Super. at 23. In contrast, here, the exclusion of the check was not "outcome-determinative." Id. at 24.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3836-16T3