NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1874-12T4

FRANCES PARKER,
Individually and as
General Administratrix
of the ESTATE OF DALE S.
PARKER,

        Plaintiff-Appellant,

v.

JOHN W. POOLE, M.D.,

        Defendant-Respondent,

and

HOLY NAME HOSPITAL and
DOUGLAS BENSON, M.D.,

        Defendants.
_____

> **APPROVED FOR PUBLICATION**
>
> **March 17, 2015**
>
> **APPELLATE DIVISION**

        Argued October 7, 2014 — Decided March 2, 2015

        Before Judges Yannotti, Hoffman and Whipple.

        On appeal from Superior Court of New Jersey,
        Law Division, Bergen County, Docket No. L-
        7098-09.

        Dennis T. Smith argued the cause for
        appellant (Pashman Stein, attorneys; Mr.
        Smith and David G. White, on the briefs).

        Philip F. Mattia argued the cause for
        respondent (Mattia & McBride, P.C.,
        attorneys; Mr. Mattia, on the brief).

The opinion of the court was delivered by

HOFFMAN, J.A.D.

Plaintiff Frances Parker, individually and as administrator of the estate of her late husband, Dale Parker ("Mr. Parker"), appeals from the no cause jury verdict returned in the medical malpractice case against her husband's surgeon, defendant John W. Poole, M.D., and from the order denying plaintiff's motion for a new trial. Plaintiff contends that the trial court erred in excluding certain evidence. For the reasons that follow, we reverse and remand for a new trial.

I.

We begin by summarizing the most pertinent trial evidence. Mr. Parker was diagnosed with colon cancer when a tumor was discovered during a colonoscopy. A biopsy had revealed that Mr. Parker had an invasive adenocarcinoma of the colon,[1] and he was referred to defendant to immediately undergo surgery to remove the tumor. Defendant, a board-certified general surgeon, saw decedent for a surgical consult on February 13, 2009. Defendant performed the surgery, a transverse colon resection, to remove the tumor on February 19, 2009. After removing the tumor,

---

[1] According to defendant, invasive adenocarcinoma of the colon is a "pathologic diagnosis," which "means the tumor has spread beyond the basic membrane of the lining of the intestine," creating "a risk for it to . . . further spread."

defendant performed an open anastomosis, sewing the colon back together, to close the opening. Defendant reported no difficulties during the surgery.

After the surgery, Mr. Parker remained in the hospital. At some point between February 22 and 23, he developed complications. On February 23, nurses observed blood-tinged fluid coming from the surgical site. Examination by defendant revealed that Mr. Parker had developed a dehiscence.[2] Based on the risk of the incision re-opening, defendant decided to perform a second operation to repair the dehiscence.

On February 24, defendant performed the second surgery. During the procedure, defendant noticed some "murky fluid in the abdominal wound." As a result, he investigated to determine if there was an anastomotic leak, a hole or perforation in the intestine that allows intestinal contents to leak into the abdomen. While defendant testified, "We never saw a hole[,] [w]e never saw a perforation," he nevertheless decided to resect or remove the anastomosis. He explained, "I felt the anastomosis was not perfect[;] . . . my job as a surgeon was to make the anastomosis perfect." Defendant continued to follow Mr. Parker after the surgery on the 24th; however, "he had a

_____

[2] According to plaintiff's surgical expert, David Befeler, M.D., "dehiscence is a failure of the abdomen wall closure," meaning "the abdominal wall comes apart."

cataclysmic rapid demise and ultimately expired early on the 26th."

Plaintiff's theory in the case was that defendant negligently performed the first anastomosis, creating a leak, which led to sepsis, and that defendant then negligently failed to address the sepsis. Specifically, plaintiff contended that, because defendant encountered evidence of infection in the second surgery, he should have performed an ileostomy, a procedure where a loop of small bowel would have been externalized to stop feces from coming into the abdomen, and then drained the abdomen to remove the purulent fluids, and allowed Mr. Parker to heal. Once healed, Mr. Parker could have undergone a re-anastomosis. Defendant indicated that he performs such "ostomy" procedures "all the time."[3]

The defense disputed the source of the sepsis which caused Mr. Parker's death, as well as the timing of the onset of the sepsis. At trial, plaintiff sought to introduce defendant's deposition testimony, specifically, an exchange in which defendant responded to a question about the cause of Mr. Parker's death:

Q:   Why did Mr. Parker die?

---

[3] Defendant explained, "when we externalize the colon, it's a colostomy, when we externalize the small bowel, it's an ileostomy."

A:    It appears that he got septic, though
      I'm not sure why he had such a rapid
      demise.

Q:    To what did you attribute the sepsis?

      [Defendant's Counsel]: Objection, but
      you can answer.

A:    I have to assume that it was related to
      the anastomotic leak.

When plaintiff sought to read this deposition excerpt into the record as part of her case, defendant objected, arguing that the language he used in response ("I would have to assume") was speculative. Plaintiff argued that it was an admission by a party-opponent and thus admissible under N.J.R.E. 803(b)(1), regardless of any claimed speculative nature.

The trial court sustained the objection, finding the testimony speculative. The court also appeared to question the propriety of plaintiff attempting to elicit expert testimony from defendant.

> Essentially, what plaintiff urges — it converts [defendant] into an expert witness. It's asking him to render an opinion when, in fact, he's being called as a fact witness. Now we have a number of expert witnesses who have opined as to Mr. Parker's cause of death. [I]t's not really a [N.J.R.E.] 701 [issue], where we're asking for opinion testimony of a lay witness because it's not [an] opinion as to . . . how fast was he going in your common experience.

It's an opinion that requires expertise. The reality, it seems, is that the . . . cause of death isn't so much the ultimate question here. . . . [T]he ultimate question is, whether or not [defendant] departed from the standard of care required of him. And I do think that it is asking for, again over the objection of [defendant's] attorney, for him to become an expert witness against himself.

And in addition to that, it is cumulative and it is calling for speculation on his part. And therefore, I'm going to uphold [defendant's] objection and I'm not going to allow it to be read into evidence[.]

On direct examination, defendant testified that "Mr. Parker had no evidence of sepsis at the time leading up to the [second] surgery, at the time of the surgery, and immediately in the recovering room after the surgery."[4] Nevertheless, in the operative report defendant dictated immediately after the second surgery, he wrote, "I did not want to take the chance the anastomosis was leaking and would cause <u>further</u> sepsis." (Emphasis added). Defendant attempted to explain this apparent contradiction in the following colloquy, still on direct examination:

---

[4] According to defendant, "Sepsis is an infection that causes systemic changes." Its symptoms are "increased respiratory rate, an increased pulse, . . . an elevated temperature and an elevated white [blood cell] count." Sepsis can be diagnosed by the presence of two such symptoms as well as a "documented source of infection[.]"

Q: When you said you were concerned it would cause further sepsis what did you mean by further sepsis?

A: I meant at a point in time. I might have actually dictated future sepsis but I mean, further down the road. I would — a chance at this would cause sepsis. So unfortunately — I probably dictated like I speak but they transcribe it but —

Q: It would have been future as opposed to further?

A: Well, I'm dictating a medical record I'm not a novelist. In my mind, I was using — it might not be the most eloquent — but I'm trying to say, I couldn't take the chance of this would — anastomosis would break down and cause sepsis in the future, cause further sepsis. That was my job to not take that chance.

Q: Did there come a time that Mr. Parker did become septic?

A: Yes, there was.

Q: When was that?

A: He became septic several hours after the surgery in the intensive care unit.

Later that day, during cross-examination, defendant disputed that he saw evidence of an anastomotic leak during the second surgery, despite his operative report listing "[p]robable anastomotic leak" among his post-operative diagnoses:

Q: Eventually, you determined that there was a probabl[e] anastomotic leak that

you encountered in the second surgery[,] right?

A: That's not true. What . . . I said — and I said yesterday is that when we got in there, that putting . . . everything together . . . the anastomosis did not look perfect. And I said it was my job, as the surgeon, to make sure that the patient is as perfect as I can make [him]. So, I made the decision that [I] needed to resect that anastomosis.

Q: You're denying that you . . . determined that there was a probabl[e] anastomotic leak?

A: Yes, I am.

. . . .

Q: Do you recognize that?

A: That's my operating report from that day; correct.

Q: Mmm-hmm. And the postoperative diagnosis that you put down includes probabl[e] anastomotic leak[,] right?

A: That's correct. Look, you asked me if I determined that's what it was. That's different than a determination . . . . That's what I'm concerned about. That it wasn't perfect and I redid it.

. . . .

Q: I'll jump back to something that we actually . . . advanced to before. In the final analysis, we did determine that there was a probable anastomotic leak in this patient, right?

8

A: No.

After the completion of defendant's testimony, plaintiff moved for reconsideration of the court's decision to exclude defendant's deposition testimony ("I have to assume that it was related to the anastomotic leak") regarding the cause of Mr. Parker's sepsis. [T]he court denied the motion, reiterating, that "the comment that [defendant] nevertheless articulated was speculative. And, in fact, he said 'I have to assume.' Which, I think, is as great an indication of speculation [as] you're going to get, in any case."

The next day, the jury returned a verdict, finding that defendant had not deviated from accepted standards of care and was therefore not negligent.[5] Plaintiff filed a motion for a new trial, arguing that defendant's deposition testimony should have been admitted under N.J.R.E. 803(b)(1) as an admission by a party-opponent, and that the exclusion of this evidence resulted in a clear miscarriage of justice under the law. R. 4:49-1. The court denied the motion, and this appeal followed.

On appeal, plaintiff seeks a new trial, contending that the trial court's erroneous evidentiary rulings regarding defendant's deposition testimony constituted reversible error.

---

[5] The jury voted six to one that defendant did not deviate from accepted standards of care in his treatment of Mr. Parker.

Specifically, plaintiff argues that the trial court improperly excluded defendant's deposition testimony, and asserts that the testimony was admissible under N.J.R.E. 803(b)(1), the hearsay exception for statements by a party-opponent. Plaintiff contends that defendant's deposition testimony is not speculative, but emphasizes that the exception applies even if the statement were speculative. Finally, plaintiff argues that the deposition testimony is not subject to exclusion under N.J.R.E. 403.

## II.

"In reviewing a trial court's evidential ruling, an appellate court is limited to examining the decision for abuse of discretion." Hisenaj v. Kuehner, 194 N.J. 6, 12 (2008); accord Purdy v. Nationwide Mut. Ins. Co., 184 N.J. Super. 123, 130 (App. Div. 1982). We are required to disregard an error unless, after consideration, we find "it is of such a nature as to have been clearly capable of producing an unjust result[.]" R. 2:10-2.

### A.

We first address the trial court's comments suggesting that defendant's deposition testimony about the cause of Mr. Parker's sepsis might be excludable because "it converts [defendant] into

10                                                              A-1874-12T4

an expert witness[,]" and asks "him to render an opinion when, in fact, he's being called as a fact witness."

"[A] plaintiff in a medical malpractice [action] can ask questions of a defendant doctor in a deposition which seek to elicit expert opinions relevant to the diagnosis and treatment of the plaintiff." Hutchinson v. Atl. City Med. Ctr.-Mainland, 314 N.J. Super. 468, 477 (App. Div. 1998) (citing Rogotzki v. Schept, 91 N.J. Super. 135 (App. Div. 1966)).

> It is clear that defendants may be deposed as to the facts of the treatment they gave — what they did, what they saw, and the diagnoses rendered. It is also clear that they may not be asked to respond to purely hypothetical questions. But we think it plain that it is not "opinion" to have them explain why something was done or not done.
>
> [Rogotzki, supra, 91 N.J. Super. at 152.]

In Rogotzki, we rejected the argument "that a treating physician who is a party defendant may not be compelled to answer on depositions such questions as call for his expert opinions or conclusions related to the treatment he rendered." Id. at 145.

> There is nothing unfair about such a practice. Unlike his counterpart in a criminal prosecution, the defendant in a civil suit has no inherent right to remain silent or, once on the stand, to answer only those inquiries which will have no adverse effect on his case. Rather, he must, if called as a witness, respond to virtually all questions aimed at eliciting information

11

he may possess relevant to the issues, even though his testimony on such matters might further the plaintiff's case. We cannot agree with the suggestion that it is somehow neither sporting nor consistent with the adversary system to allow a party to prove his case through his opponent's own testimony but, whatever the merits of this view, we prefer to believe that, in a situation such as the present, [t]he ultimate requirement that judicial decisions be based on the . . . facts overcomes any detriment which might be suffered by the adversary system.

[Id. at 149 (alterations in original) (quoting McDermott v. Manhattan Eye, Ear & Throat Hosp., 203 N.E.2d 469, 474 (Ct. App. 1964) (citations and internal quotation marks in McDermott omitted)).]

Our Supreme Court subsequently indicated its approval of Rogotzki, stating, "Proof of deviation elicited from the defendants themselves, because they are competent professionals, could be relied on by the jury." Lanzet v. Greenberg, 126 N.J. 168, 191 (1991) (citing Rogotzki, supra, 91 N.J. Super. at 148-49); see also, Hutchinson, supra, 314 N.J. Super. at 478-81 (holding that the trial court properly allowed plaintiffs to use the defendant doctor's deposition testimony as evidence of the applicable standard of care).

Furthermore, it is well established that a treating doctor testifying as a fact witness is permitted to testify about the cause of the patient's disease or injury, because causation is an essential part of diagnosis and treatment. See Stigliano v.

12

Connaught Labs., Inc., 140 N.J. 305, 314 (1995) (holding "the characterization of [such] testimony as 'fact' or 'opinion' creates an artificial distinction").  "[T]estimony about the likely and unlikely causes of [a patient's condition] is factual information, albeit in the form of opinion."  Ibid.

The questioning of defendant at his deposition reasonably sought to ascertain defendant's opinion regarding the timing and cause of Mr. Parker's sepsis, two critical issues in the case. As the surgeon who performed both operations, defendant was arguably in the best position to make these determinations. From his operative report, it would appear that he did, in fact, make these determinations by diagnosing a "[p]robable anastomotic leak[,]" and his statement that he "did not want to take the chance the anastomosis was leaking and would cause further sepsis."

B.

We next address the trial court's determination to exclude defendant's deposition testimony regarding the cause of Mr. Parker's sepsis because it was "speculative."

N.J.R.E. 803(b)(1) provides that a "statement offered against a party which is . . . the party's own statement, made either in an individual or in a representative capacity," is not excluded by the hearsay rule.  Nevertheless, testimony

admissible under this rule is still subject to other restrictions. Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 1 on N.J.R.E. 803(b)(1) (2014) ("Note that [N.J.R.E.] 403 is not the exclusive means for excluding a statement admissible under [N.J.R.E. 803(b)(1)]. In appropriate cases other constitutional, statutory or rule requirements might preclude a statement admissible under this Rule.").

N.J.R.E. 701 generally restricts the subject matter of lay witness testimony:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue.

The question is thus whether N.J.R.E. 701 restricts testimony otherwise admissible under N.J.R.E. 803(b)(1). Our courts have not yet addressed this issue. Therefore, we look to federal precedent interpreting analogous provisions of the Federal Rules of Evidence.

F.R.E. 801(d)(2)(A) is the parallel provision to our N.J.R.E. 803(b)(1). It provides that a "statement . . . offered against an opposing party[,] . . . made by the party in an individual or representative capacity[,]" is not hearsay. Thus, the substance of the provisions is essentially the same.

14

Federal courts have addressed the interaction between the party-opponent rule and other provisions. The courts have specifically exempted statements under F.R.E. 801(d)(2)(A) from the personal-knowledge requirement for testimony. See, e.g., United States v. Ammar, 714 F.2d 238, 254 (3d Cir.) ("[I]t is clear from the Advisory Committee Notes that the drafters intended that the personal knowledge foundation requirement of [F.R.E.] 602 should . . . not [apply] to admissions . . . admissible under [F.R.E.] 801(d)(2)."), cert. denied, 464 U.S. 936, 104 S. Ct. 344, 78 L. Ed. 2d 311 (1983); Mahlandt v. Wild Canid Survival & Research Ctr., Inc., 588 F.2d 626, 630-31 (8th Cir. 1978) (holding that the personal knowledge requirement does not apply to F.R.E. 801(d)(2)).

Additionally, statements by a party-opponent are not subject to trustworthiness considerations. "Trustworthiness is not a separate requirement for admission under [F.R.E.] 801(d)(2)(A)." Jewell v. CSX Transp., Inc., 135 F.3d 361, 365 (6th Cir. 1998); accord United States v. Pinalto, 771 F.2d 457, 459 (10th Cir. 1985). "The admissibility of statements of a party-opponent is grounded not in the presumed trustworthiness of the statements, but on 'a kind of estoppel or waiver theory, that a party should be entitled to rely on his opponent's

statements.'" <u>Jewell</u>, <u>supra</u>, 135 <u>F.</u>3d at 365 (quoting <u>United States v. DiDomenico</u>, 78 <u>F.</u>3d 294, 303 (7th Cir. 1996)).

In <u>Donlin v. Aramark Corp.</u>, 162 <u>F.R.D.</u> 149, 150 (D. Utah 1995), the district court directly addressed the issue of speculation for party-opponent admissions, and found that "the fact that the statement is speculative or in opinion form is not of consequence. Personal knowledge of the witness is not required in a party admission circumstance."

This interpretation echoes 4 <u>Wigmore on Evidence</u> § 1053 (Chadbourn rev. 1972):

> A primary use and effect of [a party] admission is to discredit a party's claim by exhibiting his inconsistent other utterances. It is therefore immaterial whether these other utterances would have been independently receivable as the testimony of a qualified witness. . . . In particular, <u>personal knowledge</u>, as indispensable to a witness, is not required.
>
> [<u>Ibid.</u> (emphasis in original) (citations omitted).]

<u>Wigmore</u> goes on to specifically address the lay opinion rule, saying that it "does not limit the use of a party's admissions [because] [t]he reason for that rule does not apply to a party's admissions." <u>Id.</u> at § 1053(3).

Thus, federal precedent supports the position that <u>N.J.R.E.</u> 701 does not independently bar speculative testimony admitted under <u>N.J.R.E.</u> 803(b)(1). Therefore, we conclude the trial

court erred in excluding defendant's deposition testimony regarding the cause of Mr. Parker's sepsis on the basis that it was speculative.

We further note that the record does not provide any actual support that the deposition testimony was speculative. The court failed to hold a Rule 104 hearing to explore the issue further. While it may be possible the testimony was speculative, the record lacks any evidence or convincing argument explaining how or why the testimony constituted speculation.

In summary, we conclude defendant's deposition testimony regarding the cause of Mr. Parker's sepsis is admissible under N.J.R.E. 803(b)(1). The statements were made by defendant, a party to the action, and were offered by plaintiff against him at trial. Plaintiff's question was not improper, and whether defendant was speculating when he answered is irrelevant to the statement's admissibility.

### C.

Finally, we address the application of N.J.R.E. 403. The trial court's oral opinion on plaintiff's motion for new trial did not explicitly address N.J.R.E. 403, but the court stated, "I believe . . . the statement by [defendant] was prejudicial and not probative, and that's why I excluded it."

17

N.J.R.E. 403 provides:

> [R]elevant evidence may be excluded if its probative value is substantially outweighed by the risk of (a) undue prejudice, confusion of issues, or misleading the jury or (b) undue delay, waste of time, or needless presentation of cumulative evidence.

Under this test, "[e]vidence should be barred if its probative value 'is so significantly outweighed by [its] inherently inflammatory potential as to have a probable capacity to divert the minds of the jurors from a reasonable and fair evaluation of the basic issue[s].'" Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 491 (1999) (alterations in original) (quoting State v. Thompson, 59 N.J. 396, 421 (1971)). "The burden is clearly on the party urging the exclusion of evidence to convince the court that the N.J.R.E. 403 considerations should control." Rosenblit v. Zimmerman, 166 N.J. 391, 410 (2001) (citation and internal quotation marks omitted).

Due to the nature of the weighing test, highly prejudicial evidence may only be admitted if it has "overwhelming probative worth." Green, supra, 160 N.J. at 491. However, "'[t]hat evidence is shrouded with unsavory implications is no reason for exclusion when it is a significant part of the proof.'" State v. Stevens, 115 N.J. 289, 308 (1989) (quoting State v. West, 29 N.J. 327, 335 (1959)).

Moreover, N.J.R.E. 403 concerns only undue prejudice. State v. Bowens, 219 N.J. Super. 290, 297 (App. Div. 1987). "The question . . . is not merely whether the treating doctor['s] testimony [was] prejudicial[,] . . . but whether it [was] unfairly so." Stigliano, supra, 140 N.J. at 317. Generally, much of the evidence introduced at an adversarial trial is prejudicial to the opposing party, and we "would ill-serve the cause of truth and justice if we were to exclude relevant and credible evidence only because it might help one side and adversely affect the other." Ibid.

Counsel is permitted to attack the credibility of a witness on cross-examination. N.J.R.E. 611(b). "Cross-examination is the greatest legal engine ever invented for the discovery of truth." State v. Silva, 131 N.J. 438, 444 (1993) (citation and internal quotation marks omitted). Any witness "may be cross-examined with a view to demonstrating the improbability or even fabrication of his testimony." Id. at 445 (citation and internal quotation marks omitted).

A prior inconsistent statement may also be used to attack the credibility of a witness. N.J.R.E. 607; Silva, supra, 131 N.J. at 444-45; State v. DiRienzo, 53 N.J. 360, 383 (1969). Deposition testimony of a witness may be used "for the purpose

of contradicting or impeaching" a witness at trial. R. 4:16-1(a).

Here, the fact that defendant testified at deposition consistent with his operative records but then testified differently at trial, attempting to discredit his own operative reports, clearly went to the issue of his credibility. Accordingly, the trial court erred when it did not allow plaintiff's counsel to impeach defendant's credibility with his prior inconsistent deposition testimony.

Defendant's deposition testimony strikes at the heart of this case. As a statement by the surgeon who actually performed the procedures and observed, first hand, Mr. Parker's condition, it carries compelling probative worth. Stigliano, supra, 140 N.J. at 317 ("[T]he probative value of the treating doctors' testimony outweighs its prejudicial effect under N.J.R.E. 403" because of their first hand proximity to the patient's condition.). As the trial court noted concerning the expert witnesses here, "[t]he people who articulate that there was an anastomotic leak were not in the surgery. And, really had no direct way of making that determination." Defendant, however, was necessarily present at the surgery, affording him the ability to make direct observations.

The existence of the anastomotic leak and its effect were the central issues at trial. While the statement is prejudicial, the undue prejudice to defendant is minimal because the statement at issue is his, rather than a third party's statement. "[T]he party who made the out-of-court statement cannot complain of his [or her] inability to confront and cross-examine the declarant, since he [or she] is the declarant." Biunno et al., supra, comment 1 on N.J.R.E. 803(b)(1).

D.

Lastly, we must consider whether the trial court's decision to exclude defendant's deposition testimony was "clearly capable of producing an unjust result[.]" R. 2:10-2.

The proofs in this case do not overwhelmingly favor one party or the other; hence, the improper exclusion of defendant's contradictory deposition testimony could have been the deciding factor in his favor. Cf. State v. Frost, 158 N.J. 76, 87 (1999) (noting that where credibility is the central issue and the "jury must choose which of two opposing versions to credit, it simply cannot be said that the evidence is overwhelming[ly]" against one litigant or the other). The risk that the jury was improperly influenced by the trial court's exclusion of defendant's deposition testimony is particularly high here

because defendant's credibility was central to the outcome of the case.

Under the circumstances of this case, we are convinced that this error was "clearly capable of producing an unjust result[.]" R. 2:10-2. The excluded deposition testimony bore directly on the issue of defendant's negligence and thus could readily have been outcome-determinative. Because the exclusion of this evidence could have affected the jury's determination of whether defendant was negligent, a new trial is required.

Reversed and remanded for a new trial.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1874-12T4