NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-3336-18

AHMED HASSAN and SALWA
HASSAN,

      Plaintiffs-Appellants,

v.

ROLAND WILLIAMS and
ABF FREIGHT SYSTEM
INCORPORATED,

      Defendants-Respondents.

_____

> Argued May 26, 2020 – Decided April 13, 2021
>
> Before Judges Messano, Ostrer, and Vernoia.
>
> On appeal from the Superior Court of New Jersey,
> Law Division, Ocean County, Docket No. L-0213-16.
>
> Paul M. Brandenburg argued the cause for appellants
> (Rebenack, Aronow & Mascolo, LLP, attorneys;
> Edward J. Rebenack, of counsel and on the briefs;
> Tyler J. Hall and Paul M. Brandenburg, on the briefs).
>
> Jerald F. Oleske argued the cause for respondents
> (Oleske & Oleske, LLP, attorneys; Jerald F. Oleske,
> on the brief).

The opinion of the court was delivered by

OSTRER, J.A.D.

Plaintiff Ahmed Hassan appeals from a no-cause judgment in his motor vehicle negligence suit.[1] Defendant Roland Williams rear-ended Hassan. Hassan was driving a FedEx tractor-trailer, and Williams was driving a tractor-trailer for defendant ABF Freight System. The jury found both drivers negligent, but Hassan slightly more so. Hassan principally contends the court erroneously excluded statements by ABF officials that Williams could have prevented the accident, he drove recklessly, and he violated ABF safety protocols. We agree those statements should have been admitted into evidence. We therefore reverse and remand for a new trial.

I.

The truckers collided on Route 78 near Clinton. It was around 4:00 a.m. on a June morning. As he had for three years, Hassan was driving his normal route from Newark Airport to Allentown, Pennsylvania. Suddenly, he felt himself "on the ramp, on the side of the road, and hitting like I don't know if it was trees, brushes, whatever." Hassan could not remember how fast he was going, or other pre-crash details. A police report stated that the FedEx truck

---

[1] Mr. Hassan's wife, Salwa Hassan, is also a plaintiff-appellant. But, for convenience, we use the singular "plaintiff" and attribute appellants' arguments to him.

A-3336-18

snapped a light pole, not a tree, and blocked westbound traffic when it came to rest.

Williams said his truck was on cruise control, and set at the truck's pre-set top speed of 62 m.p.h. Williams said, "[A]ll of a sudden, out of nowhere I come up on this Fed-Ex truck." As he rapidly approached Hassan's truck, Williams's instinct was to change lanes. But, he looked in his side mirror, and saw a car. He then looked ahead, and slammed on his brakes before striking Hassan's tractor trailer in the rear. Williams was not sure of Hassan's speed. He saw the taillights on Hassan's truck, but no flashers or brake lights.

Once Hassan's truck came to a stop, he exited, and at first felt "fine." But, shortly after, while still at the scene, Hassan said he collapsed to the ground. Emergency medical staff told him he needed to go the hospital. Once there, Hassan began feeling pain in his "neck, [] shoulders, [] upper back." From the hospital, Hassan was driven back to his car in Allentown, and he drove himself home.

In the subsequent complaint, Hassan alleged that Williams and ABF were negligent and negligent per se, and ABF was vicariously and strictly liable for Williams's acts. Hassan requested compensatory and punitive damages. His wife asserted a per quod claim. Hassan alleged the collision caused a traumatic brain injury, and shoulder and wrist injuries; and

exacerbated a back condition. He alleged cognitive loss, depression, and other neurological problems.

Although both parties initially viewed the collision as an uncomplicated "rear-end hit," defendants vigorously contested liability after producing an expert's opinion that Hassan caused the accident. Relying on skid marks, fuel spills, and various calculations, the expert asserted that Hassan cut in front of Williams at a slow speed from the entrance lane. Hassan's expert disagreed in a pre-trial report, but he did not testify at trial.

Defendants also challenged Hassan's damages claim. Defendants argued he exaggerated his ailments; and, to the extent they were real, the accident did not cause them. Of particular importance on appeal, defendants suggested that either Hassan's soccer playing, family history of Alzheimer's, or "white matter disease" was responsible.

The parties' pre-trial motion practice gives rise to the principal issues on appeal. Hassan filed a motion to compel discovery from ABF. Among other requests, Hassan demanded that defendants produce "[c]opies of all records of Roland Williams for the 7 days prior to the collision" including "weight/scale tickets," "on-board computer records," and "overweight/oversize reports and citations." Hassan contended that federal motor carrier safety regulations required ABF "to maintain driver record of duty status logs and all supporting

documents," and that the documents related to his contention that ABF failed to assure safe truck operation. Hassan also demanded that defendants produce "[c]opies of all satellite communications and email for the day of the collision and seven days prior" as well as other electronic information on Williams's truck, including the truck's "vehicle speed limit," its "maximum vehicle speed recorded" and the "number of hard brake incidents."

Defendants objected, arguing that the information would not lead to admissible evidence, and the categories of documents lacked definition. In a letter brief opposing Hassan's motion, defendants added that the first group of requested documents were "not remotely relevant to this simple motor vehicle accident," and the second group was "not directed to any issue that may exist with reference to this claim." Defendants asserted that the accident was "rather straight forward" and "involve[d] no unique or perplexing liability issues." Notably, defendants did not argue that production of the requested documents would be unduly burdensome, nor present competent evidence to support such an argument. Defendants had not yet produced their expert opinion on liability.

The court denied Hassan's motion to compel production of those documents "for the reasons cited by [d]efendant in response."

A-3336-18

Hassan also filed motions in limine to establish the admissibility of statements by Williams and two other ABF employees, and the inadmissibility of evidence pertaining to aspects of Hassan's health. Hassan sought to introduce Williams's deposition testimony that Williams did not question why ABF considered disciplining him after the accident. Williams explained, "I had hit this FedEx truck in the rear. It automatically makes you wrong when you hit someone in the rear. I don't care what the circumstances [are]."

Hassan also wanted to introduce into evidence ABF's post-accident letter firing Williams. ABF's Manager of Line Operations, Chuck Witter, wrote to Williams, stating, "The Safety Department in Fort Smith, AR has determined that your accident . . . has been judged preventable. This is to advise you that you are hereby discharged due to your recklessness resulting in a serious preventable accident while on duty." Evidently referring to a collective bargaining agreement, the letter continued, "In accordance with Article 44 of the Central Pennsylvania Over-the-Road and Local Cartage Supplemental Agreement, this discharge is for recklessness resulting in a serious preventable accident." Copies were sent to a Teamsters local and union steward.

And Hassan wanted to introduce excerpts from the deposition testimony of Sam Cates, who worked in ABF's safety department in Arkansas, and was ABF's corporate representative on "issues dealing with safety." Hassan

6

proposed to offer the following interchange, to establish that Williams

deviated from ABF safety training and procedures:

> Q. As the director of safety, are there any circumstances where ABF finds that it is allowable for its road driver to run into the back of another car?
>
> A. No sir.
>
> . . . .
>
> Q. As the director of safety, as you read Mr. Williams' statement about the incident, did ABF require Mr. Williams to already know whether he could change lanes?
>
> . . . .
>
> A. He should have known.
>
> Q. According to his statement, would you agree with me that he stated that he did not know?
>
> A. He's saying he looked to see if he could change lanes, so I would have to say he didn't look prior to approaching the FedEx vehicle.
>
> Q. As the director of safety for ABF, based upon the statement by Roland Williams, would you agree that he violated ABF's rules and regulations for road drivers?
>
> . . . .
>
> A. I would say he failed to maintain proper lookout of what was ahead of him and didn't allow himself an out. He should have been able to stop or change lanes.

A-3336-18

Q. Would you agree that that is a violation of ABF's rules and regulations for its road drivers?

. . . .

A. No, I wouldn't know that I [would] say it's a violation. I would say it's contrary to what we train in.

Cates also shed light on the "preventability determination" that Witter mentioned in the termination letter. Cates testified that ABF concluded the accident was "preventable." He explained that Witter's letter stating that conclusion was based on the accident preventability analysis that Cates's department conducted. Cates also explained that he would not have called Williams reckless, as Witter did, which he defined to mean "not exercising due care and caution when operating a vehicle." Cates said he would have called Williams "inattentive."

At the motion-in-limine hearing, the court ruled Cates could describe ABF's rules and regulations for truck drivers, but he could not say if, in ABF's opinion, Williams violated them. The court barred Williams's statement discussing his own fault or how ABF viewed a rear-end collision. And, the court also barred Witter's letter in its entirety. Hassan argued the letter was an admission against interest, but the court disagreed, stating the letter was a determination of fault that was ultimately within the province of the jury. The court stated, "It's inappropriate to have somebody come in and offer an opinion

8                                                      A-3336-18

on the ultimate issue in the case," which is the "jury's determination." The court also noted that both Witter and Cates lacked personal knowledge of the accident. Evidently referring to Witter, the court said he was "[s]omeone who wasn't there . . . didn't see it, and . . . who's relying on the opinion of someone a thousand miles away [Cates]" without knowing the basis for that opinion.

Hassan also filed a motion to prevent defendants from questioning his medical expert on the possibility that Hassan suffers from Alzehimer's disease. Defendants indicated they intended to have their expert testify that Hassan suffered from Alzheimer's, since he was taking a drug that was FDA-approved to treat the disease, and he had a family history of it. The court ruled defendants were not allowed to have their own expert opine that Hassan could be suffering from Alzheimer's, since it was "too inflammatory" and no witness was prepared to say Hassan in fact was suffering from the disease. However, defendants could question Hassan's medical expert on cross-examination whether he believed Alzheimer's or white matter disease contributed to the crash. Also, although defendants could not elicit testimony that Hassan may

have been a malingerer, they could present testimony that his physical injuries were psychogenic.[2]

After the close of testimony and summation, the jury of eight found Hassan and Williams were both negligent, and allocated fifty-one percent of fault to Hassan. The trial court entered a judgment of no cause. Hassan then filed a motion for a new trial, which the court denied.

On appeal, Hassan contends the court erred by (1) barring Witter's letter and Cates's and Williams's statements; (2) denying his motion to compel discovery; and (3) permitting prejudicial questioning and comment by defense counsel about Alzheimer's and other subjects.

## II.

We consider first the court's exclusion of Witter's discharge letter, Cates's deposition excerpts, and Williams's statement about ABF's approach to rear-end hits. "Although we may not simply substitute our judgment for the trial court's, we shall not affirm an evidentiary ruling that represents 'a clear error of judgment.'" State v. Vargas, 463 N.J. Super. 598, 613 (App. Div. 2020) (quoting State v. Perry, 225 N.J. 222, 233 (2016)).

---

[2] Psychogenic is defined as "originating in the mind or in mental or emotional conflict." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/psychogenic (last visited February 10, 2021).

On the other hand, we are obliged to affirm an evidentiary decision if it reached "the proper conclusion . . . based on the wrong reasoning." Hayes v. Delamotte, 231 N.J. 373, 387 (2018). In holding the statements were inadmissible, the court wrongly concluded they would usurp the function of the jury by addressing an "ultimate issue." However, ABF's decision to discharge Williams was properly excluded because it was a subsequent remedial measure. N.J.R.E. 407. The balance of the discharge letter and Cates's and Williams's statements should have been analyzed as statements of a party opponent, N.J.R.E. 803(b). As such, they were admissible.

A.    Ultimate Issue

The trial court erred in reasoning that the Cates deposition excerpts and the statements in the discharge letter usurped the jury's function by addressing an "ultimate issue." First, the court mischaracterized the evidence. Second, statements may not be excluded solely because they may embrace an ultimate issue. Third, while ultimate issue evidence may be excluded for other reasons, those reasons do not apply or were not applied in this case.

Our Evidence Rules abolished the so-called "ultimate issue rule." "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." N.J.R.E. 704. The rule does not define "ultimate issue." But our

11

cases make clear that a witness may testify that a defendant deviated from a standard of care. See, e.g, Jacober v. St. Peter's Med. Ctr., 128 N.J. 475, 497 (1992) (stating that expert could testify that a certain catheter "[wa]s the appropriate size" to use on the plaintiff-infant, not the one the defendant used). Even before the Rules of Evidence were adopted, we held "opinion testimony of experts relating to the ultimate issue, i.e., the propriety and safety of a condition or appliance is allowed." Shutka v. Pa. R. Co., 74 N.J. Super. 381, 401 (App. Div. 1962).

That does not mean that ultimate issue testimony may never be excluded. The rule refers to evidence "otherwise admissible." N.J.R.E. 704. So, a court may still bar a witness from telling a jury what result to reach in a case (for example, that a criminal defendant is guilty), or from offering a purely legal conclusion. A court may do so, but not because such statements do not embrace an ultimate issue. Rather, a court may bar ultimate issue opinions, among other reasons, if they are unhelpful. See, e.g., State v. Cain, 224 N.J. 410, 427 (2016) (noting that "an expert is no better qualified than a juror to determine the defendant's state of mind," an "ultimate issue," after the expert has tutored the jury on "the peculiar characteristics of drug distribution"). Or, they are unreliable. See, e.g., Jacober, 128 N.J. at 497 (stating an expert may "offer reliable opinion testimony about the ultimate issue at trial").

12

Or, they are unduly prejudicial, as with opinions about guilt or essential elements of crimes. See, e.g., Cain, 224 N.J. at 427-28 (noting that expert's testimony on ultimate issue state-of-mind causes "prejudice and potential confusion . . . [that] outweighs any probative value it may possess"); State v. Sowell, 213 N.J. 89, 100 (2013) (stating that expert testimony embracing an ultimate issue "can be excluded if 'the risk of . . . undue prejudice, confusion of issues, or misleading the jury' substantially outweighs its probative value") (quoting N.J.R.E. 403); State v. McLean, 205 N.J. 438, 454 (2011) (stating the "risk of undue prejudice" is "'significant'" if an expert investigating officer "'offers an opinion on an ultimate issue in the case'") (quoting State v. Berry, 140 N.J. 280, 301 (1995)); State v. Landeros, 20 N.J. 69, 74-75 (1955) (reversing conviction because of police officer's prejudicial testimony regarding the defendant's guilt).

As the Federal Advisory Committee observed:

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria. Thus the question, "Did T have capacity to make a will?" would be excluded, while the question,

"Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?" would be allowed.

[Advisory Committee Note to Fed. R. Evid. 704, 56 F.R.D. 183, 285 (1972).]

Here, the trial court mischaracterized the statements as "ultimate issue" evidence. Neither Cates nor Witter said how the case should be decided, nor did they offer a legal conclusion, let alone an "inadequately explored" one, that Williams acted negligently. Rather, Cates testified, as a factual matter, that Williams deviated from ABF's training and protocols. Cates also concluded, in his safety evaluation, that the accident was "preventable." That opinion was repeated in Witter's letter. But, "preventable" evidently is not the same as negligent.[3] Also, although Witter said Williams drove "reckless[ly]," he did not define the term. Perhaps, it was defined in the apparent collective

_____

[3] Cates did not disclose ABF's definition of "preventable" in the record before us. Williams testified he understood it to mean the "driver could have d[one] something to keep the accident from happening. Basically [it] is saying the driver [is] at fault." We note that the Motor Carrier Safety Regulations include at least two definitions. See 49 C.F.R. § 385.3 (defining a "[p]reventable accident on the part of a motor carrier [to] mean[] an accident (1) that involved a commercial motor vehicle, and (2) that could have been averted but for an act, or failure to act, by the motor carrier or the driver"); 49 C.F.R. Pt. 385, App A (stating that "[i]f a driver, who exercises normal judgment and foresight, could have foreseen the possibility of the accident that in fact occurred, and avoided it by taking steps within his/her control which would not have risked causing another kind of mishap, the accident was preventable").

bargaining agreement that he referenced in his letter; or he used the word in its common, everyday meaning. However, there is no reason to believe he had in mind the term's legal meaning under our tort law.

Furthermore, even if the statements were deemed to embrace the ultimate issue, they may not be barred on that basis. N.J.R.E. 704. We acknowledge that N.J.R.E. 701 and 702 may generally provide grounds to bar an ultimate issue opinion — because, for example, it was an expert's net opinion, or a lay opinion unsupported by personal knowledge. But, as we discuss below, those rules do not bar the introduction of a statement of a party opponent. Finally, the trial court engaged in no N.J.R.E. 403 balancing. In sum, the trial court erred in characterizing Cates's and Witter's statements as embracing the ultimate issue, and then excluding them on that basis.

B.    Hearsay

We also reject defendants' argument that the statements of Cates, Witter, and Williams were excludable hearsay. They were admissible as statements of a party opponent. N.J.R.E. 803(b).

Witter wrote his letter, and Cates made his statements, in their respective capacities as representatives of defendant ABF. The statements were "offered against a party-opponent" — ABF. N.J.R.E. 803(b). And, in each case, the statement was made "by a person authorized by the party-opponent to make a

15

statement concerning the subject."  N.J.R.E. 803(b)(3).  ABF presented Cates in discovery as its corporate representative on safety issues.  Defendants do not challenge Witter's authority to write the discharge letter as he did.[4]

In any event, Witter wrote the letter while he was an "agent or servant" of ABF, "concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  N.J.R.E. 803(b)(4).  The statement itself — for example, Witter's statement that Williams was reckless — need not fall within the scope of the agency or employment.  The statement need only "concern[] a matter within the scope of the agency or employment" — in this case, Witter's firing authority.  See 5 Weinstein's Federal Evidence § 801.33[1] (2021) (making that distinction).

Williams's statement was admissible against him, because it was his "own statement, made either in an individual or in a representative capacity."  N.J.R.E. 803(b)(1).  It is unclear if Williams's statement would be admissible against ABF as a statement of ABF, because Williams may have been retired when he made the statement.  See Matter of Opinion 668 of Advisory Comm.

---

[4]  We recognize that the Safety Department's determination that the accident was preventable was hearsay within the hearsay of Witter's letter.  However, "[h]earsay within hearsay is not excluded by the rule against hearsay if each part of the combined statements conforms with an exception to the rule."  N.J.R.E. 805.  The Safety Department's determination — which Cates confirmed in his deposition — was also a statement of a party-opponent.

on Pro. Ethics, 134 N.J. 294, 300 (1993) (stating, referring to N.J.R.E. 803(b)(4), that "[f]ormer employees are not, strictly speaking, covered by the [e]vidence [r]ule").

Although defendants reiterate the trial court's concern that both Witter and Cates lacked personal knowledge about the collision, that lack of knowledge is no reason to exclude their statements. Their statements still qualify as those of a party-opponent under the rule, because personal knowledge is not required. See Parker v. Poole, 440 N.J. Super. 7, 19 (App. Div. 2015) (noting that "courts have specifically exempted statements under F.R.E. 801(d)(2)(A) from the personal-knowledge requirement for testimony"); 2 McCormick on Evidence § 254 (8th ed. 2020) (noting that the party who makes a statement of a party-opponent "is not required to have firsthand knowledge of the matter declared").

Nor must the proponent demonstrate that the party-opponent's statement has an "indicia of reliability," as defendants argue. "[S]tatements by a party-opponent are not subject to trustworthiness considerations." Parker, 440 N.J. Super. at 19. The proponent also need not establish, as defendants contend, that the declarants "possessed the expertise necessary" to offer their opinions. Just as a party-opponent's statement of opinion need not satisfy the personal knowledge requirement of the lay opinion rule, N.J.R.E. 701, see Parker, 440

17

N.J. Super. at 20, a party-opponent statement of opinion need not satisfy the expertise requirement of the expert opinion rule, N.J.R.E. 702, see Advisory Committee Note to Fed. R. Evid. 801(d)(2)(A), 56 F.R.D. at 297 (referring to "[t]he freedom which admissions have enjoyed . . . from the restrictive influences of the opinion rule and the rule requiring firsthand knowledge").

And, for purposes of admitting a statement of a party-opponent, it does not matter if, as defendants contend, Hassan "offered no proof" that Witter's letter was "a statement against ABF's interest." "A statement admitted under N.J.R.E. 803(b)(1) does not have to be contrary to the party's interest when made." See, e.g., State v. Covell, 157 N.J. 554, 572 (1999). That is required to admit statements under N.J.R.E. 803(c)(25).

Since Cates's and Witter's statements are admissible as statements of a party opponent only against ABF, and Williams's statement is admissible as a statement of a party opponent only against Williams, the trial court on remand will need to determine whether the limited use of the statements can be adequately addressed through jury instructions.

Alternatively, on remand, Hassan may try to offer some of the statements as statements against interest. N.J.R.E. 803(c)(25). If so admissible, they could be offered against all defendants. Hassan would need to establish that Cates's or Witter's statements were "so far contrary to . . .

[ABF's] pecuniary, proprietary, or social interest, or so far tended to subject [ABF] to civil . . . liability . . . that a reasonable person in . . . [Cates's or Witter's] position would not have made the statement unless . . . [Cates or Witter] believed it to be true." N.J.R.E. 803(c)(25).[5] Hassan would also need to establish that Williams's discussion of ABF's policy in rear-end collisions was also "so far contrary" to his pecuniary interests or would "so far tend[] to subject" him to civil liability. We do not reach the issue whether any of the statements would be admissible under N.J.R.E. 803(c)(25), because Hassan on appeal confines his argument to N.J.R.E. 803(b) and caselaw interpreting that rule (notwithstanding that he mistakenly described the rule as pertaining to statements against interest).

C.    Subsequent Remedial Measure

As noted, if the trial court reached the right result for the wrong reason, we are obliged to affirm. We do so regarding the order excluding Witter's statement discharging Williams. However, for reasons we discuss below, the discharge statement should be redacted from the rest of the letter.

_____

[5] Evidently, federal regulators rate the safety of interstate motor carriers, 49 C.F.R. § 385.5, and among the factors considered are "indicators of preventable accidents" and "whether . . . preventable accident indicators have increased or declined over time," 49 C.F.R. § 385.7(f). Conceivably, a statement that an accident was "preventable" may be "so far contrary" to ABF's "pecuniary, proprietary, or social interest" by undermining ABF's standing with federal regulators.

Although evidence of Williams's discharge was not excludable as hearsay, otherwise "admissible hearsay must avoid the exclusions found in Article IV of our Rules of Evidence." Vargas, 463 N.J. Super. at 610. The statement discharging Williams was properly excluded because his discharge was a post-event "remedial measure." N.J.R.E 407. Once fired, he could not get into more accidents. And Hassan offered the firing to "prove that the event was caused by [Williams's] negligence or culpable conduct." Ibid.

Under the common law, "evidence of remedial measures is excluded not because it lacks relevancy, but because the court, to refrain from discouraging such measures, declares it incompetent." Hansson v. Catalytic Constr. Co., 43 N.J. Super. 23, 29 (App. Div. 1956); but see Brown v. Brown, 86 N.J. 565, 580-81 (1981) (stating that the rule excluding subsequent remedial measures is also based "on the unreliability of any inference of an admission of culpability by the defendant").

Before adoption of our Rules of Evidence, the Court of Errors and Appeals held, in a case involving a bus colliding into a truck, that "[e]vidence that a driver ha[d] been discharged soon after an accident is not competent as an implied admission that the driver had been careless." Rynar v. Lincoln Transit Co., 129 N.J.L. 525, 530 (E. & A. 1943). Although we have found no New Jersey case deeming a responsible employee's discharge a subsequent

20

remedial measure under our Rules of Evidence, we have no doubt that N.J.R.E. 407 applies, as did its predecessor, Evid. R. 51. See Judson F. Falknor, Extrinsic Policies Affecting Admissibility, 10 Rutgers L. Rev. 574, 591 (1956) (stating that Uniform Rule of Evidence Rule 51 "finds its most common application in respect . . . of . . . the discharge of an employee charged with causing an injury" among other measures, and stating that the rule "appears broad enough to cover any situation which, by existing law, is within the sweep of the exclusionary principle").[6]

N.J.R.E. 407 "follows the principle stated by . . . Fed. R. Evid. 407." 1991 Supreme Court Committee Comment to N.J.R.E. 407. Therefore, we may look to federal cases for guidance. Parker, 440 N.J. Super. at 19. Courts applying Fed. R. Evid. 407 have found discharging a responsible employee to be a subsequent remedial measure. See, e.g. Nolan v. Memphis City Schools, 589 F.3d 257, 274 (6th Cir. 2009) (stating that "[e]vidence that an employer subsequently discharged an employee accused of causing a plaintiff's injury

---

[6]  Evid. R. 51 stated, "When after the occurrence of an event remedial or precautionary measures are taken, which, if taken previously would have tended to make the event less likely to occur, evidence of such subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."  N.J.R.E. 407 states, "Evidence of remedial measures taken after an event is not admissible to prove that the event was caused by negligence or culpable conduct.  However, evidence of such subsequent remedial conduct may be admitted as to other issues."

may be properly excluded as a subsequent remedial measure under Rule 407");

<u>Mahnke v. Wash. Metro. Area Transit Auth.</u>, 821 F. Supp. 2d 125, 152 (D.D.C. 2011) (stating that Fed. R. Evid. 407 barred evidence of bus driver's discharge). <u>See also</u> 2 <u>Weinstein's Federal Evidence</u> § 407App.01 (2021) (quoting Advisory Committee Notes acknowledging that the rule covers discharge of responsible employees).[7]

However, N.J.R.E. 407 does not bar admissibility of a post-accident investigation, even if it prompted the discharge. We again look to other persuasive sources absent controlling New Jersey authority. Evidence of post-accident investigations lies outside the rule because the investigations "are conducted or prepared for the purpose of investigating the cause of the accident, and can rarely be characterized as 'measures' which, if conducted previously, would have reduced the likelihood of the accident." 2 <u>Weinstein's Federal Evidence</u> § 407.06 (2021). Put another way, safety is only furthered when measures are taken as a result of the investigation. <u>Ibid.</u>

---

[7] Fed. R. Evid. 407 originally stated, "When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." Pub. L. 93-595 (Jan. 2, 1975). The rule was remodeled to state: "When measures are taken that would have made an earlier injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction." Fed. R. Evid. 407.

Thus, courts have excluded evidence of subsequent remedial measures under Rule 407, but not the investigation that preceded them. See, e.g., Rocky Mtn. Helicopters, Inc. v. Bell Helicopters Textron, 805 F.2d 907 (10th Cir. 1986) (affirming trial court decision to exclude evidence of helicopter redesign, but not a post-accident study about the prior design); Fox v. Kramer, 994 P.2d 343 (Cal. 2000) (stating that California analog to Rule 407 "would appear to include only subsequent actions taken to repair or correct a problem identified by an investigation — not the factual inquiries undertaken to determine whether such repair or correction was necessary"). "[T]he policy considerations that underlie Rule 407, such as encouraging remedial measures, are not as vigorously implicated where investigative tests and reports are concerned." Rocky Mtn. Helicopters, 805 F.2d at 918. And, "[t]o the extent that such policy concerns are implicated, they are outweighed by . . . the danger of depriving 'injured claimants of one of the best and most accurate sources of evidence and information.'" Id. at 918-19 (quoting Westmoreland v. CBS, Inc., 601 F. Supp. 66, 68 (S.D.N.Y. 1984)).

In particular, courts have distinguished between evidence of a discharge, and the investigatory report that may have prompted it. In J.B. Hunt Transport, Inc. v. Guardianship of Zak, 58 N.E.3d 956, 963 (Ind. Ct. App. 2016), a case involving an automobile-truck collision, the trial court excluded

23

evidence of the driver's firing as a subsequent remedial measure, but not reports of the trucking company's internal review process. On the trucking company's appeal, the Indiana appellate court affirmed, holding that "evidence of post-accident investigations are not automatically excluded as subsequent remedial measures." Id. at 967. See also J.M. v. City of Milwaukee, 249 F. Supp. 3d 920, 931-32 (E.D. Wisc. 2017) (distinguishing between evidence of police officer's firing, which was inadmissible under Rule 407, and "the investigation leading to that act, namely the determination in the Discharge Proceedings that his search was unreasonable"); Aranda v. City of McMinnville, 942 F. Supp. 2d 1096, 1104 (D. Or. 2013) (noting the "distinction . . . between the actual disciplining of officers for their conduct, which could constitute a remedial measure, and the investigation that precedes a disciplinary process"); Bullock v. BNSF Ry. Co., 399 P.3d 148, 158-59 (Kan. 2017) (affirming appellate court's distinction between evidence of discipline and evidence of investigative conclusion).[8] Where investigative conclusions and discipline are found in the same document, appropriate

---

[8] We find unpersuasive the view that if an employee's discharge is barred as a subsequent remedial measure, so is the internal investigation that led to the discharge. But see Mahnke, 821 F. Supp. 2d at 152 (excluding investigation leading to discharge of bus driver involved in collision); Martel v. Mass. Bay Transp. Auth., 525 N.E.2d 662, 664 (Mass. 1988) (same).

redactions should be made, rather than excluding the entire document.  Id. at 158.

In sum, N.J.R.E. 407 excludes evidence of Williams's discharge.  But the rule does not exclude evidence of ABF's investigation, including Cates's finding that Williams violated ABF safety protocols, and the collision was preventable; and Witter's opinion that Williams acted "reckless[ly]."[9]  However, that does not complete the analysis.

D.    N.J.R.E. 403

We turn, finally, to whether the probative value of the statements by Cates and Williams, and the redacted letter of Witter, would be "substantially outweighed by the risk of (a) [u]ndue prejudice, confusion of issues, or misleading the jury; or (b) [u]ndue delay, waste of time, or needless presentation of cumulative evidence."  N.J.R.E. 403.  Had the court engaged in

---

[9]  We recognize that in "certain rare circumstances," a court may shield statements in a "self-critical analysis," where "confidentiality concerns . . . outweigh the need for disclosure."  Payton v. N.J. Tpk. Auth., 148 N.J. 524, 546 (1997).  However, defendants do not argue that ABF's preventability analysis amounts to a "self-critical analysis."  Furthermore, "[i]t is not so clear that disclosure inevitably will discourage candid self-criticism."  Id. at 547.  In particular, "when a deliberating body is required by law to prepare an honest report, replete with self-evaluation, we do not assume that that body will shirk its responsibilities in order to hide the truth."  Ibid.  In this case, one may question whether evidentiary exclusions would affect a motor carrier's preventability investigations, especially if they are responsive to federal regulations.  See 49 C.F.R. § 385.5; 49 C.F.R. § 385.7(f).

A-3336-18

that balancing, it would command our deference. See Covell, 157 N.J. at 569 (stating that a court may overturn an N.J.R.E. 403 determination "[o]nly where there has been a 'clear error of judgment'" (quoting State v. Koedatich, 112 N.J. 225, 313 (1988), cert. denied, 488 U.S. 1017 (1989))). "Yet, where the trial court fails to apply the proper legal standard in evaluating the admissibility of evidence, we review the evidentiary ruling de novo." State v. Trinidad, 241 N.J. 425, 448 (2020). In Trinidad, the trial court failed to conduct an N.J.R.E. 403 analysis. So, the Supreme Court conducted one itself. Ibid.

So shall we. We conclude that the excluded statements had significant probative value. Cates stated that Williams did not adhere to the safety protocols that he was taught and "he failed to maintain proper lookout of what was ahead of him," he "didn't allow himself an out" and "[h]e should have been able to stop or change lanes." Those statements were relevant to the jury's determination whether Williams exercised reasonable care, including, as the judge instructed the jury, whether Williams "use[d] reasonable care in the control, management, and operation of his machine," and whether he made "such observations for traffic and road conditions and to exercise such judgment as to avoid collision or injury to others upon the highway as a

reasonably prudent person would have done under those circumstances."[10] Cates's Safety Department conclusion that the collision was preventable, which Witter restated in his discharge letter, pertains to the same question. ABF had determined that Williams had it in his power to avoid the collision.

Likewise, Witter's statement that Williams drove recklessly also had significant probative value. Although Witter did not define the term in his letter, it conveyed to the jury that Williams's own boss believed he acted without sufficient care.

Lastly, Williams's own acknowledgement that ABF blamed any driver who struck another vehicle in the rear was probative. We are not convinced by Hassan's argument that Williams's statement admitted fault. Rather, it described how ABF viewed his actions. Still, it was highly probative, since ABF was denying fault at trial.

The probative value of these statements was not outweighed, let alone "substantially outweighed" by "[u]ndue prejudice, confusion of issues, or misleading the jury." N.J.R.E. 403(a). The evidence would not "divert jurors 'from a reasonable and fair evaluation'" of the issues before them. See State v. Moore, 122 N.J. 420, 467 (1991) (quoting State v. Sanchez, 224 N.J. Super.

---

[10] The court's instruction followed virtually verbatim the Model Jury Charges (Civil), 5.30A "General Duty Owing" (approved Aug. 1999).

231, 249-50 (App. Div.) <u>certif. denied</u>, 111 N.J. 653 (1988)).  Furthermore, appropriate jury instructions — for example, distinguishing between "preventability" and "negligence" — would manage any risk the jury would be confused or misled by the witnesses' statements.[11]

E.    <u>Rule</u> 2:10-2

Finally, we conclude that the court's order excluding Witter's letter, and Cates's and Williams's statements, were "clearly capable of producing an unjust result," <u>R.</u> 2:10-2, compelling a new trial.  The jury found both Hassan and Williams negligent, and found Hassan only two percent more at fault than Williams.  The excluded evidence was clearly capable of convincing the jury to assign slightly more responsibility to Williams and slightly less to Hassan.  In short, the excluded statements could have been "the deciding factor in [Hassan's] favor."  <u>Parker</u>, 440 N.J. Super. at 23.  Therefore, Hassan (and his wife) are entitled to a new trial.

---

[11] <u>Cf.</u> <u>Tyson v. Old Dominion Freight Line, Inc.</u>, 608 S.E.2d 266, 270 (Ga. Ct. App. 2004) (holding that the trial court did not abuse its discretion in finding that the prejudicial effect of admitting a motor carrier's finding that the accident was "preventable" outweighed its probative value because the carrier's "definition of preventable is different from the standard of liability").  Notably, we are not reviewing the trial court's discretionary balancing.  Instead, we review the issue de novo.

III.

A.

Hassan argues that the court erred in denying his motion to compel responses to his discovery requests. We "are not to intervene but instead will defer to a trial judge's discovery rulings absent an abuse of discretion or a judge's misunderstanding or misapplication of the law." Capital Health Sys., Inc. v. Horizon Healthcare Servs., Inc., 230 N.J. 73, 79–80 (2017) (citing Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 371 (2011)). Although mindful of the high bar appellants face, we agree the motion judge erred in denying the discovery request for documents.

"[A]ppellate courts must start from the premise that discovery rules 'are to be construed liberally in favor of broad pretrial discovery.'" Horizon Healthcare, 230 N.J. at 80 (quoting Payton v. N.J. Tpk. Auth., 148 N.J. 524, 535 (1997)). "Our court system has long been committed to the view that essential justice is better achieved when there has been full disclosure so that the parties are conversant with all the available facts." Jenkins v. Rainner, 69 N.J. 50, 56 (1976). "To determine whether the materials sought by [Hassan] are discoverable, their potential relevance is the initial inquiry. In deciding whether evidence is relevant the focus is on the 'logical connection between the proffered evidence and a fact in issue[.]'" In re Liquidation of Integrity

Ins. Co., 165 N.J. 75, 82 (2000) (alteration in original) (quoting State v. Hutchins, 241 N.J. Super. 353, 358 (App. Div. 1990)). "N.J.R.E. 401 defines relevant evidence as 'evidence having a tendency in reason to prove or disprove any fact of consequence to the determination of the action.'" Ibid.

The motion judge denied Hassan's request for the documents we have described, evidently agreeing with defendants that the complex documents were not relevant to liability issues in what seemed to be a "straight forward" accident case. As a threshold matter, there is no competent evidence in the record demonstrating that these documents were so complex. More importantly, complexity and relevance are not mutually exclusive. In a case that may seem simple, complex documents can add support to a party's arguments. That is true here. The requested documents, including satellite and "black box" data, concern such matters as the speed the truck was traveling, what it was carrying, how the brakes were used, and the condition of the driver. Such information was relevant to understanding how the accident occurred.

We reject defendants' newly minted argument that Hassan's discovery demand was "onerous." Defendants did not resist the discovery request on that ground before the trial court, let alone provide any competent evidence to support such a claim. See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234

30

(1973) (stating that "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such presentation was available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest'" (quoting Reynolds Offset Co., Inc. v. Summer, 58 N.J. Super. 542, 548 (App. Div.) certif. denied, 31 N.J. 554 (1960))).

We also are unpersuaded by defendants' contention Hassan was obliged to revive his request for the information, evidently through a motion to reconsider, after defendants served their expert report. We disagree. Our court rules place a "continuing obligation" on a party responding to a "request to produce" to update its response throughout the pre-trial litigation as needed. See R. 4:18-1(b)(3). Once defendants concededly "radically shifted" "[t]he complexion" of the case with their experts' opinion, defendants bore the responsibility to reassess their response, and disclose what they withheld based on their prior characterization of the case.

Without the benefit of the discovery itself, and perhaps an expert analysis of its significance, we cannot decide that withholding it led to an unjust result, requiring a new trial. R. 2:10-2. However, we need not reach the question, as we reverse based on the exclusion of Cates's and Williams's statements and Witter's letter with the discharge portion redacted.

31

B.

Hassan contends the court erred in allowing defendants to elicit testimony concerning the possibility he was suffering from Alzheimer's disease. He also contends the court erred in allowing defense counsel to cross-examine his expert on aspects of his medical history.

The court barred defendants from eliciting testimony from their own medical expert that Hassan might suffer from Alzheimer's disease, as there was no competent evidence from a medical professional that Hassan actually did. However, the court allowed defendant to cross-examine Hassan's treating neurologist and medical expert witness, who asserted that the collision caused Hassan neurological injury, whether he considered pre-existing "white matter disease" or "anxiety."

At trial, defense counsel asked the expert witness whether he considered Hassan's family medical history, particularly that his father had dementia. The expert testified he noted the family history of dementia in his report. Defense counsel then asked whether people with dementia "drive real slow." Hassan's counsel objected. The judge directed defense counsel to "move on," interrupted defense counsel's attempt to argue the point, and then asked the expert, "Doctor, you don't have any medical evaluation of driving patterns with

people with dementia; do you?" The witness answered no, and the judge responded, "All right."

Defense counsel's questioning was improper. Instead of probing the basis of the medical expert's damages-related opinion, defense counsel evidently suggested that Hassan may have driven slowly — as defendants' accident reconstruction expert asserted — because he had incipient dementia. Although the court did not expressly sustain the objection, nor provide a curative instruction, the court minimized any harm by establishing that the doctor had no evidence that people with dementia drive slowly. Defense counsel did not attempt to make the connection again in closing. We therefore conclude that the fleeting remark, by itself, was not capable of producing an unjust result.

## C.

We reach the same conclusion with respect to questioning about a 2002 medical record indicating Hassan had suffered a wrist injury. The court agreed to bar such inquiry, as defense counsel had not questioned any of the medical experts during their depositions. Nonetheless, defense counsel cross-examined Hassan on whether he recalled this injury. After Hassan reviewed the record to refresh his memory, he stated he did not remember the injury. However, the jury never reached the issue of damages. So, the error was harmless.

Hassan's remaining arguments lack sufficient merit to warrant discussion in a written opinion.  R. 2:11-3(e)(1)(E).

Reversed and remanded for a new trial.  We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION