# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0001-23

R.F.W.,[1]

    Plaintiff-Respondent,

v.

J.L.A.W.,

    Defendant-Appellant.

_____

Submitted September 12, 2024 – Decided September 17, 2024

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FM-04-0309-21.

Law Office of Louis Guzzo, attorneys for appellant (Eric R. Foley, on the brief).

Weir Greenblatt Pierce, LLP, attorneys for respondent (Deena L. Betze, on the brief).

PER CURIAM

---

[1] We utilize initials pursuant to Rule 1:38-3(d).

Defendant J.L.A.W. appeals from July 27, July 28, and August 21, 2023 orders, as well as a July 28, 2023 final judgment entered by the Family Part. Collectively, the orders and judgment awarded plaintiff R.F.W. physical custody of the parties' child, E.W., and placed the child with her paternal relatives pending completion of reunification therapy with plaintiff. We affirm.

I.

This matter was tried over the course of eleven days and the trial judge heard testimony from nineteen witnesses, including: the parties, their psychological experts, treating psychologists, family members, and other fact witnesses. The focus of the parties' divorce trial was custody of their then-six-year-old child. The central dispute was whether plaintiff had abused the child, as alleged by defendant, or if defendant was alienating the child from plaintiff as a means of prevailing in the custody dispute. The trial judge rendered a thoughtful and well-reasoned oral opinion, in which she concluded the latter was the case.

The parties were married in 2009, and E.W. was born approximately seven years later. The marriage was characterized by tumult and volatility, which emanated from defendant's accusations that plaintiff was unfaithful. Defendant's delusional behavior resulted in her insulting, threatening, and

2

physically abusing plaintiff. Defendant believed plaintiff's training in the military allowed him to surveil her from long distances, including from his family's home in Alaska, through electronic devices, smoke detectors, and vents in the marital residence. Defendant accused plaintiff of wanting to have sexual relations with strangers walking on the street. On one occasion she screamed at plaintiff, claiming he was a demon and that she could see demons.

Defendant had a lengthy history of mental health problems. In 2006, she was hospitalized for attempting to overdose on pills and striking herself in the head with a rock. She was diagnosed with "[m]ajor [d]epression [s]ingle [e]pisode [s]evere [w]ithout [p]sychosis." In the past, she suffered from anorexia. In 2015, a therapist reported that defendant was hearing voices when nobody was home. Defendant testified her current diagnosis was post-traumatic stress disorder.

Both parties parented E.W. after she was born and were involved in every aspect of her day-to-day care. However, the relationship declined in August 2017, when the parties went to visit plaintiff's family in Alaska. Plaintiff's mother was dying of cancer and plaintiff wanted to see her and have E.W. spend time with her grandmother. During the visit, defendant accused plaintiff's family of making fun of her and calling her names. Defendant's conduct was so

3

severe that plaintiff had to take her and E.W. to the airport to return to New Jersey while he finished visiting his family. When defendant and the child returned to the marital residence, defendant began experiencing delusions that plaintiff was communicating insults. When plaintiff returned to New Jersey, he noticed defendant had dismantled a smoke detector and she woke plaintiff up to tell him he had threatened to kill her in his sleep.

E.W. was sleeping in bed with the parties when defendant made the accusation. Prior to the Alaska trip, the child had not slept in the parties' bed, but afterward she began to regress and could not sleep independently. Defendant continued to accuse plaintiff of misconduct while the parties were in bed.

The trial judge heard audio recordings made by plaintiff of defendant's bizarre conduct in the child's presence. In one recording, plaintiff was reading to E.W. because defendant would not. As he did so, defendant interrupted by making inappropriate comments to the child regarding the parties' physical relationship, including as the judge found, "asking for permission to have an affair" and telling the child "daddy is trying to drive a wedge between them, [and] . . . that he would never take her . . . . "

The parties saw a marriage counselor in 2019. The counselor testified defendant made similar accusations about plaintiff, including claiming he was

A-0001-23

threatening her during their session. The counselor did not observe plaintiff threaten defendant.

Defendant disclosed she had been sexually abused in the ninth or tenth grade. The counselor suggested defendant's past trauma was influencing the marriage and suggested defendant return to therapy. However, she advised she was no longer receiving therapy and taking her medications because the medications made her tired, and she philosophically disagreed with the treatment. She also disagreed that her past trauma impacted the marriage. The marriage counseling sessions were subsequently ended.

In June 2020, defendant received a Facebook friend request from a woman neither party knew. Defendant accused plaintiff of having an affair with the woman and told E.W. the woman was "daddy's girlfriend." Defendant's comments made the child nervous, and she began to laugh and agree with defendant. Plaintiff decided to move to his sister's home in Pennsylvania because he did not want this dynamic to grow and further adversely impact E.W.

The parties' separation began defendant's process of alienating E.W. from plaintiff. Defendant controlled how plaintiff would see the child. In August 2020, E.W. visited plaintiff at his sister's home, and they enjoyed playing in the hot tub. Afterwards, the child was too tired to bathe. When E.W. returned to

A-0001-23

her mother, defendant noticed redness on the child's vagina. Defendant contacted the Division of Child Protection and Permanency (Division) and alleged plaintiff sexually abused E.W. Following the referral, defendant ended plaintiff's parenting time.

The Division's intake worker testified and explained the Division's investigation process. Defendant made other accusations against plaintiff, including that she saw him penetrate E.W.'s labia with his fingers and the child had pain after visiting with plaintiff. Defendant also claimed E.W. made "French kissing motions and stated that's how her dad kisses her."

E.W. did not disclose any abuse to the Division. However, due to her young age and the nature of the accusations, she was subjected to a sexual assault evaluation. The evaluation revealed no evidence of abuse, and the child did not disclose any abuse to her examiners.

Both parties told the intake worker there were two incidents of domestic violence prior to E.W.'s birth. The worker testified defendant was the aggressor and was arrested on at least one of the occasions.

Although the Division concluded the child was not sexually abused, defendant asked the intake worker how she could prevent E.W. from seeing her father. Defendant also urged the worker to speak with the child's therapist. At

6

first, the therapist could not be reached. Once the worker reached her and requested her records, the therapist refused and told the worker to obtain them from Pennsylvania Child Protective Services (CPS), which opened its own investigation because plaintiff resided there.

A guardian ad litem was appointed for E.W. in the CPS case. She testified her investigation raised concerns that the child's therapist had coached E.W. to tell investigators that plaintiff had harmed her.

Plaintiff's expert psychologist testified he evaluated both parties. Defendant denied a history of sexual abuse and downplayed her prior hospitalizations. The expert characterized defendant's reporting on the psychological testing as "so defensive as to render . . . the test impossible to draw valid conclusions from." Conversely, the expert found no evidence of pedophilia in plaintiff.

Defendant produced a psychological expert in rebuttal.[2] The expert reviewed plaintiff's expert report, but never met with plaintiff. The trial judge found defendant's expert not credible.

---

[2] The judge granted defendant's request to produce this witness prior to the start of trial, over plaintiff's objection.

A-0001-23

Defendant attempted to present the child's therapist as a fact and expert witness. However, the judge denied the request to treat the therapist as an expert because she did not appear for depositions or provide her records, but let the therapist testify as a fact witness.

The therapist explained she treated the child from September 2020 until November 2022. She claimed the child immediately began to act out the sexual abuse and described it "without solicitation." The therapist claimed she could not recall telling the intake worker to get her records from CPS. Although she claimed she provided all her records pursuant to a subpoena from plaintiff's attorney, she conceded E.W.'s scores on an assessment, a video of a session with the child, and notes pertaining to the child's treatment were not provided. The therapist's summaries reported E.W. made disclosures that came from defendant. She diagnosed plaintiff with pedophilia despite never meeting with him.

The trial judge made detailed findings. She concluded plaintiff was credible, including his testimony regarding the parties' history, defendant's assaults, and her "mental instability." The judge reviewed the audio recordings made by plaintiff. She described defendant's conduct as "unhinged and irrational" and concluded defendant's manipulation of the child "was apparent. It was clear that . . . defendant was irrationally fixated on the fact that she did

not want . . . plaintiff to have a relationship with the child. She looked at it as a threat. It was so odd." The judge reviewed the parties' texts after they separated and noted the "messages leading up to the allegations [of sexual abuse] . . . show that . . . defendant was planning these allegations."

The trial judge found defendant not credible and described her testimony as "combative, disingenuous, . . . [and] filled with wild imagination and fabrications. From the beginning [of] defendant's testimony, it was clear that it was distorted." Defendant lied about her mental health history, including her suicide attempt and the fact she experienced auditory hallucinations. The judge detailed the objective evidence, which showed a long history of mental health issues.

Defendant also lied when she testified plaintiff had sexually abused a niece. The trial judge recounted that defendant "seemed almost excited to act . . . out [the alleged abuse] and how [she] described it." Yet, defendant never reported the abuse.

As for E.W., the trial judge concluded defendant's testimony was "wholly not credible" because defendant never reported the incidents she testified about at trial to anyone. She "never testified once that the child was fearful of going on parenting time or refused to go see the father."

9

The judge described the Division's investigation, and the fact E.W. was subjected to a sexual assault evaluation because of defendant's allegations. She also watched a video of the child being interviewed by defendant's expert during the CPS investigation, and concluded the interview was "wholly unreliable, coached, and suggestive." The child had seen her therapist twice before the interview and received more coaching from the therapist. The judge credited the guardian ad litem's testimony that she too was concerned about the veracity of the child's interview.

The judge credited the marriage counselor's testimony that defendant never mentioned plaintiff had abused E.W. during the couple's sessions. Plaintiff's psychiatrist also testified, and the judge credited her testimony that plaintiff did not require medication, did not suffer from anxiety disorder, and was not a threat to himself or others.

The judge found the child's therapist to be "one of the biggest failures as a therapist" the judge had ever seen, because she had failed

> to recognize the manipulation of the mother. She failed to use common sense or logic. She encouraged the child and she did no collateral research. She never took a history of the mother[,] . . . never contacted the father, [and] failed to keep notes. But only provided [unreliable] summaries . . . , acted as an advocate and not as a therapist.

10

Her actions in this case contributed to the failure in this case. . . .

. . . [S]he finally admitted that a lot of the information that she relied on was from . . . defendant, not the child.

[The therapist] did not follow any of the rules or guidelines of [a] licensed clinical social worker to avoid becoming partial. She took the role of an advocate and did not take any measures to ensure undue influence or coercion. Her actions in this case contributed to the coercion by the mother.

The judge found the Division intake worker credible and gave great weight to the fact defendant was not cooperative with the Division. She noted it took three court orders for defendant to sign medical release forms and she refused to attend parenting classes. The judge credited the worker's testimony that the child denied sexual abuse, plaintiff was cooperative, and defendant was combative.

The trial judge found plaintiff's psychological expert credible, including his conclusion that defendant has carried mental health issues from her adolescence into adulthood, which she refuses to acknowledge, and therefore will not change. The judge gave great weight to the testimony of plaintiff's treating psychologist, who found he suffered from situational anxiety due to defendant's constant accusations and behavior.

11

According to the judge, plaintiff's four sisters and his brother-in-law provided credible testimony, which corroborated the other evidence in the record. The sister and brother-in-law with whom plaintiff resided corroborated that E.W. and plaintiff spent time together, and E.W. was happy in her father's company. Plaintiff's stepfather also testified credibly. The judge concluded the family trip to Alaska was a self-created debacle and defendant ruined the trip rather than anything the stepfather or plaintiff's family had done.

The trial judge analyzed each of the best interests factors under N.J.S.A. 9:2-4(c). Without repeating her findings under each factor, it suffices to say the evidence showed that each factor favored awarding custody to plaintiff, save for factors six and nine, which the judge found inapplicable. Although defendant "engaged in a systemic and methical pattern of fabrication geared towards destroying" plaintiff, the judge found "it would be more traumatic to eliminate [defendant] from the daughter's life."

As a result, the judge awarded the parties joint legal custody and plaintiff sole physical custody. Defendant was awarded supervised parenting time three days per week, and unsupervised parenting time upon presentation of "medical/psychological testimony to [the c]ourt that she is able to separate her own childhood traumas from her present life and will not continue to take

actions that alienate the father." The judge ordered E.W. to continue reunification therapy[3] until the therapist concluded it was safe to have contact alone with plaintiff.

The judge then addressed the sister and brother-in-law with whom plaintiff resided and ordered that plaintiff would vacate their home and E.W. would reside with them as her guardians, pending reunification therapy. Defendant was restrained from communicating directly with plaintiff and instead directed to communicate through plaintiff's sister. The judge instructed that no one would discuss the litigation with the child. Although the child was permitted to reside in Pennsylvania, the judge retained jurisdiction in New Jersey.

In February 2024, the reunification therapist recommended plaintiff have immediate contact with E.W. supervised by her guardians. The trial judge issued an order accordingly. Two months later, the therapist recommended plaintiff no longer be supervised and the following month the therapist recommended E.W. begin transitioning into her father's custody.

II.

---

[3] Prior to trial, plaintiff moved to begin reunification therapy. The judge granted the request on the second day of trial.

On appeal, defendant argues the trial judge adversely impacted her case by limiting her attorney from asking defendant questions during her case-in-chief. Plaintiff had previously called defendant as a witness in his case and when defendant began to present her own case, the judge limited the testimony because she viewed it as a "second bite of the apple" since the testimony covered issues defendant had already testified about. The judge also erred when she prevented defendant from calling plaintiff as a witness in her case. Defendant also asserts there was error when the judge ruled that a new therapist who had provided therapy to E.W. since January 2023 and was listed on the defense witness list could not testify.

A trial judge may exclude relevant evidence "if its probative value is substantially outweighed by the risk of . . . [u]ndue prejudice, confusion of issues, . . . misleading the [factfinder]; or . . . [it causes u]ndue delay, waste of time, or needless presentation of cumulative evidence." N.J.R.E. 403. The court also exercises "control over the mode and order of interrogating witnesses and presenting evidence to: (1) make those procedures effective for determining the truth; (2) avoid wasting time; and (3) protect witnesses from harassment and undue embarrassment." N.J.R.E. 611(a).

Trial judges have broad discretion in evidentiary matters. <u>Brenman v. Demello</u>, 191 N.J. 18, 31 (2007). We "will only reverse [an evidentiary determination] if the error 'is of such a nature as to have been clearly capable of producing an unjust result.'" <u>Ehrlich v. Sorokin</u>, 451 N.J. Super. 119, 128 (App. Div. 2017) (quoting <u>Parker v. Poole</u>, 440 N.J. Super. 7, 16 (App. Div. 2015)).

## A.

When trial commenced, defendant was represented by an attorney who tried the case for the first four days, before being joined by co-counsel on the fifth day of trial. Co-counsel was defendant's ninth attorney. On the ninth day of trial and three days into defendant's case-in-chief, co-counsel who by then was trying the case by himself, requested permission to recall plaintiff to testify. The trial judge inquired what the purpose of recalling plaintiff was and whether there was a specific line of questioning the defense intended to pursue. Counsel responded he did not intend to repeat topics already covered in plaintiff's prior testimony and wanted to limit questions to "some financial issues" that were not "specifically discussed and a couple of issues regarding certain documents that were . . . part of the . . . defense['s] exhibits." The judge concluded counsel was attempting to cover issues defendant's prior counsel did not cover the first time around and denied the application.

15

While defendant was testifying in her case-in-chief, her attorney asked her to discuss "any concerning behaviors" E.W. may have exhibited during the marriage. Plaintiff's counsel objected because defendant had testified on the subject when plaintiff called defendant to testify in his case-in-chief. The defense argued it was necessary for it to lay the foundation for exhibits that could not have been introduced during plaintiff's case. The trial judge allowed the questions for foundation purposes. Defendant then testified as follows:

> [T]here were three instances . . . of concerning touch and [E.W.'s] reaction to that touch that I witnessed between 2017 and 2020. And there . . . was also a time in February of 2020 when I both found bruises on her legs when I returned from an overnight from my mother's house where [E.W.] had been alone with [plaintiff] overnight . . . .

Defense counsel asked defendant if she reported any of these instances to child protective agencies and she explained why she did not. Counsel then asked defendant to describe the concerning behaviors in detail. Defendant described an instance from August 2017. At that point the judge stopped the testimony, noting she had heard "[t]he exact same testimony, word for word." The instances were discussed by defendant and subject to direct, cross, and re-direct examination. The judge inquired if defense counsel was asking the question because there was a document he wanted to show defendant.

16

Defense counsel then asked defendant whether "during the course of these concerning behaviors . . . there were some pictures [E.W.] drew." Defendant responded affirmatively and counsel then moved the child's pictures into evidence and questioned defendant about them at length.

We discern no improper limitation placed on the presentation of defendant's case that affected the outcome of the case. The fact that the attorney who initially cross-examined plaintiff did not cover questions co-counsel later thought should be asked of plaintiff was not a basis to recall plaintiff. Moreover, defendant's appellate submissions do not explain how an inquiry into financial issues or certain non-descript defense exhibits was relevant to the custody determination, let alone how it constituted reversible error. R. 2:10-2.

As for defendant's testimony, we note that she was able to lay a foundation for the exhibits she wanted the judge to consider, and she testified at length about their significance. The judge's decision to limit the repetition of incidents defendant had already brought to the court's attention was not an abuse of discretion, but instead a sound exercise of the discretion afforded the trial court under N.J.R.E. 403 and N.J.R.E. 611(a)(1) and (2).

B.

17

Defendant attempted to introduce testimony from a therapist E.W. had begun seeing approximately four months before the start of trial. However, the trial judge denied the request because the reports from the new therapist were provided during trial for the first time. The judge characterized the new information as "trial by ambush." Although the new therapist's name was on the defense witness list, her name was spelled wrong, and plaintiff's counsel noted she "couldn't find anybody with that name. There's no address. There's no contact information."

The judge concluded permitting the new therapist to testify would be unduly prejudicial. She remarked "this is like hitting a moving target. [Plaintiff has] no notice. . . . [A]nd . . . there's nothing provided. There is no information. . . . [H]ow does anyone prepare?"

As with evidentiary decisions in general, "[t]he admission or exclusion of expert testimony is committed to the sound discretion of the trial court." Townsend v. Pierre, 221 N.J. 36, 52 (2015) (citing State v. Perry, 140 N.J. 280, 293 (1995)). The trial judge's ruling barring a defendant from offering an expert opinion in the middle of trial was a proper exercise of discretion, which we decline to second-guess.

III.

A-0001-23

Defendant claims the trial judge mistakenly applied the law when she granted plaintiff's sister and brother-in-law custody. She asserts N.J.S.A. 9:2-4 addresses the rights of parents, and a third party's right to custody is governed by N.J.S.A. 9:2-9 and arises only when both parents are unfit. She argues this aspect of the judge's ruling, and permitting E.W.'s removal to Pennsylvania, were made without notice.

"The general rule is that findings by the trial court are binding on appeal when supported by adequate, substantial, credible evidence." Cesare v. Cesare, 154 N.J. 394, 411-12 (1998) (citing Rova Farms Resort, Inc. v. Invs. Ins. Co., 65 N.J. 474, 484 (1974)). An appellate court's usual deference to the trial court is particularly significant in family cases because Family Part judges possess "special expertise in the field of domestic relations." Id. at 412 (citing Brennan v. Orban, 145 N.J. 282, 300-01 (1996)).

Where the review concerns "questions of law, a 'trial judge's findings are not entitled to that same degree of deference if they are based upon a misunderstanding of the applicable legal principles.'" N.T.B. v. D.D.B., 442 N.J. Super. 205, 215 (App. Div. 2015) (quoting N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 434 (App. Div. 2002)). The standard of review for conclusions of law is de novo. S.D. v. M.J.R., 415 N.J. Super. 417,

430 (App. Div. 2010) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

"A custody case is squarely dependent on what is in the child's best interests." Morgan v. Morgan, 205 N.J. 50, 64 (2011) (citing N.J.S.A. 9:2-4). "[B]y seeking a divorce and invoking the jurisdiction of the Family Part, each party assent[s] to the possibility that there will be some curtailment of what would otherwise be the ordinary rights concomitant to parenthood." Sacharow v. Sacharow, 177 N.J. 62, 80 (2003). N.J.S.A. 9:2-4(a) and (b) authorize the court to award joint or sole custody. However, in N.J.S.A. 9:2-4(c) the Legislature has empowered the Family Part to make "[a]ny other custody arrangement as the court may determine to be in the best interests of the child." This is because the Family Part judges sit as parens patriae. Fantony v. Fantony, 21 N.J. 525, 536 (1956).

Pursuant to these principles and under the unique facts of this case, we conclude the trial judge did not err. The judge found there was no other way to protect E.W. between a mother who had clearly harmed her and would continue to do so, and a father who was fit to parent but for the reunification therapy necessary to transition his daughter back into his life to prevent further harm.

These findings are amply supported by the overwhelming evidence in the record and the N.J.S.A. 9:2-4(c) factors, which clearly favored plaintiff.

N.J.S.A. 9:2-9 did not apply here. That statute provides

> [w]hen the parents of any minor child . . . are grossly immoral or unfit to be [e]ntrusted with the care . . . of such child . . . and there is no other person . . . exercising custody over such child; it shall be lawful for any person interested in the welfare of such child to institute an action in the . . . Family Part. . . .
>
> [Ibid.]

The statute applies when there is a custody dispute between a parent and a third-party. Watkins v. Nelson, 163 N.J. 235, 244 (2000).

That was not the case here. Plaintiff was fit and could care for E.W. This is why the trial judge formally awarded him physical custody after applying the N.J.S.A. 9:2-4(c) factors and considering his circumstances. We interpret the judge's decision not as a custody award to plaintiff's sister and brother-in-law, but instead as a means of effectuating the judgment by placing E.W. with family temporarily, pending reunification.

Moreover, this issue is apparently moot because plaintiff's brief advises he and E.W. have been reunited. An issue is moot "when 'the decision sought in a matter, when rendered, can have no practical effect on the existing controversy.'" State v. Davila 443 N.J. Super. 577, 584 (App. Div. 2016)

21

(quoting Greenfield v. N.J. Dep't of Corr., 382 N.J. Super. 254, 257-58 (App. Div. 2006)). While this appears to be the case here, parental reunification following a proven alienation is not always linear. For these reasons, we have addressed the legality of the judge's placement decision, in the event the child regresses and a second placement with relatives becomes necessary.

Finally, defendant's appellate case information statement lists equitable distribution and counsel fees as issues on appeal. Defendant has not briefed these issues, and we therefore decline to consider them. "An issue not briefed on appeal is deemed waived." Sklodowsky v. Lushis, 417 N.J. Super. 648, 657 (App. Div. 2011).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION